## Commonwealth *vs.* Steven J. Burgess.

Plymouth. November 9, 2007. - January 11, 2008.

Present: Marshall, C.J., Ireland, Spina, Cowin, & Cordy, JJ.

*Homicide. Constitutional Law,* Confrontation of witnesses. *Evidence,* Testimonial statement, Hearsay, Hypothetical question, Self-defense. *Practice, Criminal,* Hearsay, Instructions to jury, Assistance of counsel, Argument by prosecutor. *Self-Defense.*

Discussion of case law regarding the admission in evidence of testimonial statements at a criminal trial, in light of the right to confrontation under the Sixth Amendment to the United States Constitution. [426-430]

At a murder trial, the judge erred in admitting, as evidence of premeditation, statements made by the victim to two police officers who had been called to the victim's residence in the months before the murder, where all but one of the statements were testimonial, as they were made in response to police interrogation that was not meant to secure a volatile situation or procure needed medical attention, and it was reasonable to conclude that the responses could subsequently be used in a prosecution of the defendant [430-431]; however, the erroneously admitted statements were cumulative of other properly admitted evidence, and therefore their admission was harmless beyond a reasonable doubt [431-434].

At the trial of an indictment for murder, the judge erred in allowing the prosecutor to ask hypothetical questions to a police detective testifying as an expert witness, where the questions, although reasonably based on the evidence, did not seek an expert opinion, but rather asked for observations phrased as opinion on an improper subject of expert testimony (namely, whether the witness's testimony was consistent with other testimony), and where the questions asked the witness to comment on the credibility of the Commonwealth's theory of the case; nevertheless, the error was nonprejudicial, given the abundant physical and testimonial evidence against the defendant regarding the issues in question, i.e., deliberate premeditation and extreme atrocity or cruelty [434-436]; in contrast, hypothetical questions that the prosecutor posed to a medical expert were proper, where they were based on the evidence and concerned a proper subject of expert testimony [436-437].

At a murder trial where the defendant argued self-defense, the prosecutor's statements, in closing, that the defendant pursued the victim into another room properly asked the jury to draw a reasonable inference from the evidence. [437]

The evidence at a murder trial did not warrant an instruction either on a possible verdict of voluntary manslaughter under a theory of heat of passion induced by reasonable provocation or by sudden combat [437-439] or on a possible verdict of involuntary manslaughter [439].

INDICTMENTS found and returned in the Superior Court Department on May 12, 2000.

The cases were tried before *Charles M. Grabau*, J.

*Kathleen M. McCarthy* for the defendant.

*Robert J. Bender*, Special Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant, Steven Burgess, was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity and cruelty. He was also convicted of violation of a protective order. The defendant appeals from his convictions. He raises several issues concerning two sets of statements made by the victim to police. He alleges that (1) these statements were "testimonial" and thus rendered inadmissible by the confrontation clause of the Sixth Amendment to the United States Constitution[1]; (2) one set of the statements was admitted improperly in violation of the rule against hearsay; (3) the judge's failure to instruct regarding the victim's statements created a substantial likelihood of a miscarriage of justice; and (4) trial counsel's failure to request a limiting instruction regarding the statements deprived the defendant of his right to effective assistance of counsel. The defendant maintains also that the Commonwealth's hypothetical questions to expert witnesses improperly invaded the jury's role in assessing the evidence, and that the judge erred by denying defense counsel's request for jury instructions on voluntary manslaughter and on involuntary manslaughter. Finally, the defendant urges that, if the conviction for murder in the first degree is not reversed, we should exercise our extraordinary power under G. L. c. 278, § 33E, to order a new trial or direct the entry of a verdict of a lesser degree of guilt. We affirm the convictions, and we see no basis for exercising our power under G. L. c. 278, § 33E.

*Facts and background.* We recite the facts the jury could have found, reserving further details for discussion in conjunction with the specific issues raised. In the early morning of May 1, 2000, the defendant walked into the Plymouth police station and reported that he had stabbed his father during a fight the

---

[1]The Sixth Amendment to the United States Constitution provides, in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."

previous night, and that his father was dead. Police officers were dispatched to the house that the defendant shared with his father; there, they found the body of the defendant's father, James Burgess, in the bathtub. The two stab wounds on the victim were consistent with the victim having been attacked from behind. Either of the stab wounds would have been fatal, and death likely occurred within five to ten minutes. Evidence suggested that the victim was stabbed in or near the kitchen area of the house and then made his way down a hall to the bathroom, where he died. The murder weapon, a kitchen knife, was found on the edge of the bathroom sink; the defendant's fingerprints were on the handle. Although the defendant claimed that he and his father had fought physically in the kitchen, there were no obvious signs of a struggle there, and the defendant had no bruises on his body save for a small cut on his right index finger and two marks on the side of his neck. One of the neck abrasions was consistent with a person having been scratched.

The defense at trial was that the defendant's father had been the aggressor and that the defendant acted in self-defense. The judge instructed the jury on self-defense and voluntary manslaughter on the theory of excessive force in self-defense, but refused to instruct on voluntary manslaughter on a theory of reasonable provocation or sudden combat and also on involuntary manslaughter.

During trial, the Commonwealth moved to introduce testimony from two police officers who had been called to the Burgess residence in the months before the murder, one on February 10, and the other on February 23, 2000.[2] After conducting a voir dire of both police officers, the judge ruled that the victim's statements on both occasions were admissible as spontaneous utterances.[3] Before the jury, Officer William Borriello testified that, on February 10, 2000, he responded to what was described as an "unwanted guest" call at the Burgess home. The victim answered the door and told the officer that he was concerned

---

[2]The defendant initially opposed both motions; after voir dire of Officer William Borriello, however, the defendant withdrew his objection to testimony about the February 10 incident.

[3]The judge also admitted one of the victim's utterances on February 23 under the state of mind exception to the hearsay rule.

for his son and for himself, and that he wanted his son to "get some type of medical evaluation." The victim looked "very concerned" and the defendant seemed "very agitated." The officer observed the defendant pacing back and forth, gesturing with his hands, and saying that he was being followed and that he believed his father was having him watched. The officers saw no sign of any physical altercation. The defendant was removed from the house.

Officer Dennis Hassan, Jr., testified that on February 23, 2000, he was dispatched to the house in response to a 911 hang-up call.[4] He heard "loud yelling and arguing coming from the home" as he approached the house, and could distinguish "two voices." Hassan knocked on the door; it was opened by the victim, who appeared "very upset" and "was shaking." The officer asked him "if everything was okay"; the victim answered, "No, it's not." The officer asked "what was going on"; the victim answered that "he and his son were arguing," "arguing over [the defendant] and [that the defendant] needed counseling, professional help," but refused. The officer saw the defendant near the hall in a corner of the living room by the kitchen. The victim told the officer that they had been arguing about the defendant's "living at the home," and the defendant "became very angry" with his father. The victim said that the defendant "clenched his fists and started to advance towards [the victim], stating that he'd fucking kill [the victim]." The victim said he told the defendant he had to leave the home, and that the defendant responded "that he'd come back with a gun and shoot him dead." Hassan testified that the victim indicated that he was afraid of the defendant, and told Hassan that he "felt that [the defendant] was very capable of coming back and doing something to him." The officer spoke with the defendant, who acknowledged that he and his father had been arguing over the defendant. As on the previous occasion, the defendant was removed from the home; on this occasion, the victim obtained a restraining order against the defendant, requiring him to vacate the house and refrain from abusing the victim. The order was

---

[4]A 911 hang-up call occurs when a caller dials 911, but hangs up the telephone before speaking to a 911 operator.

later modified to allow the defendant to move back into the victim's house.

*Discussion. Confrontation clause.* The defendant contends that the admission in evidence of the victim's statements to police on February 10 and 23, 2000, violate his right to confrontation under the Sixth Amendment to the United States Constitution. In particular, the defendant maintains that statements made by the victim to police were "testimonial" under the United States Supreme Court's decision in *Crawford* v. *Washington,* 541 U.S. 36 (2004) (*Crawford*), and there had been no opportunity to subject those statements to cross-examination.

The defendant was tried eleven months before the decision in *Crawford, supra,* in which the Court announced a "new rule" concerning the confrontation clause. *Whorton* v. *Bockting,* 127 S. Ct. 1173, 1181 (2007). The Commonwealth concedes that the *Crawford* principles govern the disposition of the defendant's Sixth Amendment claims. *Griffith* v. *Kentucky,* 479 U.S. 314, 322 (1987) ("failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication").

In *Crawford,* the Supreme Court held that a witness's out-of-court "testimonial" statements were inadmissible at trial except where the witness was unavailable and the defendant had prior opportunity for cross-examination. *Crawford, supra* at 59. The Court stated that the confrontation clause applied to "witnesses" against the accused, "in other words, those who 'bear testimony.' " *Id.* at 51. " 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " *Id.,* quoting 2 N. Webster, An American Dictionary of the English Language (1828). By barring testimonial statements from evidence except in limited circumstances, the Sixth Amendment sought to avert the "principal evil [of the] civil-law mode of criminal procedure, and particularly its use of ex parte examinations as evidence against the accused." *Id.* at 50. The Court declined to provide a "comprehensive definition" of testimonial statements, *id.* at 68, but discussed various formulations of the "core class" of testimonial statements:

"[1] 'ex parte in-court testimony or its functional equivalent

— that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' . . . ; [2] 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions', *White* v. *Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); [or, 3] 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' "

*Id.* at 51-52. The Court held that statements "taken by police officers in the course of interrogations" are testimonial "under even a narrow standard." *Id.* at 52. "Interrogation" was used colloquially, rather than in any technical legal sense. *Id.* at 53 n.4. The Court concluded that a wife's statements to police officers during the course of a formal police interrogation were inadmissible against her husband at his trial for assault and attempted murder of a third party. *Id.* at 40, 68-69.

In *Davis* v. *Washington*, 126 S. Ct. 2266, 2273 (2006) (*Davis*), the Court discussed the nature of "testimonial" statements barred from admission in the specific context of police interrogation. The *Davis* decision involved two consolidated cases concerning 911 calls and initial police interrogation. In the first case, the victim, as she was being attacked, reported a domestic disturbance to the 911 dispatcher and identified her attacker as her former boy friend. *Id.* at 2270-2271. At trial, the caller did not testify, and the judge admitted a tape recording of the 911 conversation. *Id.* In the second case, police responded to a "reported domestic disturbance," *id.* at 2272, but when they arrived, the wife told them that "nothing was the matter." *Id.* The husband reported that the couple had been arguing but that no physical violence had occurred. *Id.* The police separated the spouses and took a statement from the wife in which she recounted that her husband "[b]roke" furniture, "shoved" and "[h]it" her, and "[a]ttacked my daughter." *Id.* The husband was later charged with domestic battery and violating his probation. *Id.* At the subsequent bench trial, the wife was

subpoenaed but did not appear; instead, the officer who had questioned her testified about her statements. *Id.* The Court held that the statements to the 911 operator in the first case were nontestimonial and thus admissible even without the unavailability of the witness and an opportunity for cross-examination. *Id.* at 2277. It concluded that the statements in the second case were testimonial. *Id.* at 2278.

The *Davis* Court again declined to produce an exhaustive definition of testimonial versus nontestimonial statements. *Id.* at 2273. It did, however, indicate that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency . . . ." *Id.* at 2273-2274. In addition, the Court provided various indicia that help determine whether the "primary purpose" of a statement obtained during interrogation may be seen as testimonial, including (1) whether the declarant was speaking about "events *as they were actually happening* rather than describ[ing] past events"; (2) whether a reasonable interrogator would recognize that the declarant was facing an "ongoing emergency"; (3) whether the question and answer were, viewed objectively, "necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past," including whether it was necessary for the interrogator to know the identity of the alleged perpetrator; and (4) the "level of formality" of the interview. *Id.* at 2276-2277 (emphasis in original). The Court noted that "statements made in the absence of any interrogation are [not] necessarily nontestimonial," *id.* at 2274 n.1, and that "even when interrogation exists, it is in the final analysis the declarant's statements, not the interrogator's questions, that the [c]onfrontation [c]lause requires us to evaluate," *id.*

The Court determined that the victim's statements in the first case in *Davis* were made "in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." *Id.* at 2277. The operator's efforts to establish the identity of the assailant and the details of the crime scene

were crucial "so that the dispatched officers might know whether they would be encountering a violent felon," and were thus necessary to resolve the ongoing emergency. *Id.* at 2276. In contrast, the statements in the second case concerned past actions, and should have been excluded. *Id.* at 2278-2279.

After the Supreme Court's decision in *Crawford*, but before its decision in *Davis*, this court addressed the issue of testimonial statements in *Commonwealth* v. *Gonsalves*, 445 Mass 1 (2005), cert. denied, 126 S. Ct. 2980, 2982 (2006). Our decision in *Gonsalves* attempted to fill in the gaps left by the Supreme Court's opinion in *Crawford* by providing a two-step procedure for distinguishing testimonial from nontestimonial statements. We held that statements "made in response to questioning by law enforcement agents are per se testimonial, except when the questioning is meant to secure a volatile scene or to establish the need for or provide medical care." *Commonwealth* v. *Gonsalves*, *supra* at 3. "[O]ut-of-court statements made in response to questions from people who are *not* law enforcement agents" and "statements offered spontaneously, without prompting, regardless of who heard them," are not testimonial per se. *Id.* at 11. However, "out-of-court statements that are not testimonial per se must be examined to determine if they are nonetheless testimonial in fact by evaluating whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting a crime." *Id.* at 3. We adopted this articulation as the approach most consistent with *Crawford* and the historical purpose of the confrontation clause. *Id.* at 12.

Applying this two-step test to the facts of the *Gonsalves* case, we concluded that the complainant's answers to police questioning were testimonial per se because, "although the complainant remained upset, the situation had diffused"; nothing in the record indicated that the officer's questioning of the complainant was designed to secure the scene or to inquire about medical needs. *Id.* at 16-17. The complainant's responses to her mother's questions before the police arrived, however, were nontestimonial. *Id.* at 17-18. The statements were not testimonial per se because the mother's questioning could not be considered to be police interrogation, *id.* at 17; they were not testimonial in fact

because nothing in the record indicated that the complainant offered the statements in order to establish the facts for later use by law enforcement, and we saw "no reason why a reasonable person in the complainant's position would anticipate that her statement, made in her own bedroom, to her mother, apparently without any knowledge that the police would become involved, would be used against the defendant in investigating and prosecuting the alleged assault." *Id.* at 18.

Our rationale in the *Gonsalves* decision is in accord with the Supreme Court's decision in *Davis*, and we apply the *Gonsalves* two-step test to the facts of the present case. We conclude that all but one of the victim's statements to police on February 10 and 23 were testimonial, and that it was therefore error to admit them.[5] The victim's statements to Officer Borriello on February 10 were per se testimonial because they were made in response to police interrogation that was not meant to secure a volatile situation or procure needed medical attention. *Commonwealth* v. *Gonsalves*, *supra* at 3, 17. The circumstances indicated that there was no ongoing emergency, *Davis*, *supra* at 2273-2274. Although the victim appeared distressed, whatever may have prompted his call to the police had ended. The officer saw no sign of any physical altercation, and the victim's statements that he was concerned for his son and for himself, and that he wanted his son to "get some sort of medical evaluation," were not in response to questioning meant to address immediate medical needs. Nor did they indicate a need for urgent medical attention. They did not provide information "necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past." *Davis*, *supra* at 2276 (emphasis in original).

All but one of the victim's statements to Officer Hassan on February 23 were testimonial. The victim's response, "No, it's not," to Hassan's initial inquiry whether "everything was okay"

---

[5]The defendant also contends that the February 23 statements were inadmissible hearsay. Because we determine that all but one of the February 23 statements were inadmissible as a violation of *Crawford* v. *Washington*, 541 U.S. 36, 52 (2004) (*Crawford*), we consider the defendant's hearsay argument regarding only the one statement that was nontestimonial under the criteria of *Crawford* and *Davis* v. *Washington*, 126 S. Ct. 2266, 2273-2274 (2006) (*Davis*). See note 6, *infra*.

is nontestimonial. Hassan had just arrived in response to a 911 hang-up call, had heard loud voices arguing and yelling, and saw a person who "was shaking." In these circumstances, the officer's query and the victim's response were part of an attempt by the police to comprehend and deal with what appeared to be a volatile situation. *Commonwealth* v. *Gonsalves, supra* at 3. Further, the victim's response was not testimonial in fact, as a reasonable person in the victim's position would not anticipate that his response regarding whether the general situation was "okay" would be used against a specific defendant in investigating and prosecuting a crime.[6] *Id.* In contrast, the officer's subsequent questions and the victim's responses were testimonial per se, as it was then visible to the officer that the defendant was not behaving dangerously; the victim was providing more extended answers to the officer's inquiries; and it was reasonable to conclude that his responses could subsequently be used in a prosecution of the defendant. See *id.* at 16-17.

The defendant did not object on the basis of the confrontation clause either in pretrial hearings or at trial. He thus failed to preserve a challenge to the February statements on constitutional grounds. *Commonwealth* v. *Galicia,* 447 Mass. 737, 746 (2006). Nevertheless, we excuse the failure to raise a constitutional issue at trial or on direct appeal when the constitutional theory on which the defendant relies was not sufficiently developed at the time of trial or direct appeal to afford the defendant a genuine opportunity to raise his claim at those junctures of the case. *Commonwealth* v. *Rembiszewski,* 391 Mass. 123, 126 (1984), citing *DeJoinville* v. *Commonwealth,* 381 Mass. 246, 248 (1980). If constitutional error has occurred, we reverse the

---

[6]Typically, a statement must first be evaluated for admissibility under normal evidence rules, i.e., whether it qualifies as a hearsay exception. Here, the victim's statement that everything was not "okay" is admissible as a spontaneous utterance. *Commonwealth* v. *Nunes,* 430 Mass. 1, 4 (1999), quoting *Commonwealth* v. *Zagranski,* 408 Mass. 278, 285 (1990) (statement may be deemed spontaneous if "made under the influence of an exciting event and before the declarant has had time to contrive or fabricate the remark, and thus it has sufficient indicia of reliability"). Then, the statement must be appraised under the criteria of *Crawford-Davis* and *Commonwealth* v. *Gonsalves,* 445 Mass. 1, 3 (2005), to determine if it satisfies the confrontation clause of the Sixth Amendment. Here, the statement is nontestimonial by virtue of one of the *Gonsalves* exceptions.

conviction unless the error was harmless beyond a reasonable doubt. *Commonwealth* v. *Rembiszewski, supra.* We conclude that the error here was harmless beyond a reasonable doubt.[7]

The defendant argues that the February statements substantiated the Commonwealth's theory that the defendant murdered his father with deliberate premeditation. However, the "erroneously admitted evidence was 'merely cumulative' of evidence properly before the [fact finder]." *Commonwealth* v. *Galicia, supra* at 748, quoting *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 n.8 (1987). Deliberate premeditation consists of "a plan to murder . . . formed after the matter had been made a subject of deliberation and reflection," but "in view of the quickness with which the mind may act," such deliberation may take "a matter of days, hours, or even seconds." *Commonwealth* v. *Tucker*, 189 Mass. 457, 494-495 (1905). "It is not so much a matter of time as of logical sequence. First the deliberation and premeditation, then the resolution to kill, and lastly the killing in pursuance of the resolution; and all this may occur in a few seconds." *Id.* at 495.

There was substantial other evidence of premeditation from the testimony of the defendant's sister, Kelly Burgess; his former girl friend, Meredith Porter; and the victim's girl friend, Kristine Fox. Meredith Porter stated that in March, 2000, the defendant seemed unusually "upset and angry." He told her that he had argued with his father about money, that his father did not help the defendant obtain a job, and that his father suggested that the defendant obtain counseling. The defendant told Porter that he "hated" his father, and that "he wanted to get him."

Kelly Burgess testified that the relationship between the defendant and the victim "deteriorated" into frequent arguments between January, 2000, and the time of the murder, and that,

---

[7]Because we determine that the admission of the February 10 and 23 statements was harmless beyond a reasonable doubt, we need not address the defendant's contentions regarding the judge's failure to provide a limiting instruction on the statements and the ineffective assistance of counsel in failing to request such an instruction. Similarly, we need not consider the Commonwealth's argument that the right to confrontation may be forfeited by a defendant's wrongdoing, see *Commonwealth* v. *Edwards*, 444 Mass. 526, 536 (2005), i.e., that the defendant had forfeited his right to confront the victim's testimonial statements by killing the victim.

by March, 2000, the victim seemed to be "walking on eggshells" around the defendant. She stated that she spoke with the victim by telephone the night before the murder. During that conversation, the defendant had taken the telephone; his tone was "[v]ery sarcastic and he was angry," and the victim sounded "preoccupied and scared." Kristine Fox testified that, in the three months before the murder, the victim's demeanor changed from happy and outgoing to nervous and afraid, and that in March, 2000, the defendant had told her in a "loud and angry" tone that he hated his father. She also stated that, a month or two before the murder, the victim had brought a bag of guns from his house to the bar that he operated.

This testimony was supported further by the properly admitted observations of Officers Borriello and Hassan when they responded to the victim's telephone calls. Borriello said that the victim made an "unwanted guest" call, that the victim looked "very concerned," and that the defendant was removed from the house. Hassan observed that he responded to a 911 hang-up call at the victim's home, that he heard two voices yelling and arguing, that the victim looked "very upset" and "was shaking" and told him that everything was not "okay," and that the defendant said that he and the victim were arguing; as a result, the officer removed the defendant from the home. These observations further attest to the troubled relationship between the defendant and victim. Similarly, there was evidence that the victim obtained a restraining order against the defendant, requiring him to vacate the house and refrain from abusing the victim.

In addition, a finding of deliberate premeditation was clearly warranted from the stab wounds and forensic evidence. As we indicated above, deliberate premeditation can occur "within a few seconds," *Commonwealth* v. *Garabedian*, 399 Mass. 304, 312 (1987), citing *Commonwealth* v. *Tucker, supra* at 494-495. "The severe injuries inflicted on the victim . . . demonstrated 'a conscious and fixed purpose to kill continuing for a length of time . . . .' " *Commonwealth* v. *Garabedian, supra* at 312, quoting *Commonwealth* v. *Satterfield*, 362 Mass. 78, 82 (1972). The victim had two deep knife wounds, as well as a "punctate stab wound" most likely inflicted before the deeper wounds by the tip of a knife. Either of the stab wounds would have been

fatal, and death likely occurred within five to ten minutes. The victim's sweatshirt had been torn and stretched around the front of the collar. The evidence permitted the jury to find that the defendant "poked" the victim with the knife, grabbed the victim by the front of the victim's shirt collar, perhaps as the victim attempted to escape, and stabbed him twice deeply from behind. The jury could infer that in this brief period of time, the defendant formulated a plan to kill the victim and executed that plan.

*Hypothetical questions.* The defendant argues that the judge erred by allowing the prosecutor to ask hypothetical questions to two expert witnesses because the questions contained facts not reasonably supported by the evidence and improperly invaded the fact-finding province of the jury. A hypothetical question must be "based on the facts in evidence," *Commonwealth* v. *Federico*, 425 Mass. 844, 850 (1997), that is, "facts . . . testified to by [the expert witness] or upon facts assumed in the questions put to [the witness] and supported either by admitted facts or by the testimony of other witnesses already given or to be given at the trial, or upon facts derived partly from one source and partly from the other." *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 527 (1986), quoting *Commonwealth* v. *Russ*, 232 Mass. 58, 73 (1919).

The hypotheticals that the defendant claims are improper were posed to Detective Lieutenant Kenneth Martin, who had supervised evidence collection at the scene of the crime, and to Dr. James Weiner, who performed the autopsy of the victim. The prosecutor asked Martin two hypotheticals regarding the victim's stab wounds and the blood spatters and trails in the victim's home. The prosecutor first asked the expert to assume, among other facts, that (1) the victim "is poked by the assailant with the point of a knife in the abdomen area causing a punctate wound"; (2) "the assailant while behind and slightly to the right side of the victim takes the knife that he is holding in his right hand, blade down . . . and stabs the victim in a right to left, slightly downward direction once in the right chest or abdomen"; (3) "the assailant then removes the knife"; (4) "the victim places his hand with the fingers slightly curled to the wound"; (5) "the assailant in the same position as previously stated delivers a second stab wound to the right chest or abdo-

men; again right to the left and slightly downward; the knife comes in contact with the victim's left hand, slicing the middle and index fingers and the thumb, either at the time of insertion or extraction"; and (6) "[t]he victim deposits blood droplets in the hall just outside the entrance to [a] kitchen [similar to the victim's kitchen]." At the conclusion of this hypothetical, the prosecutor asked the witness: "Assuming those facts, do you have an opinion whether this scenario is consistent with what your observations were [of the crime scene]?" Over the defendant's objection, the witness answered that the assumptions were consistent. The prosecutor then asked the witness to assume a second set of facts, including (1) "the bleeding victim, moving in the direction of the bathroom, comes into contact with the left and right foyer walls outside the bathroom and deposits blood stains in that area"; (2) the victim deposits blood on various surfaces in the bathroom, including the back and hinge side of the bathroom door; (3) the victim's body is found in the bathtub; and (4) "at some point the assailant enters the bathroom and places the knife on the top of the vanity." The prosecutor asked Martin whether, "[a]ssuming those fact [*sic*], . . . do you have an opinion whether they are consistent with your observations of the [crime] scene?" Martin again responded, over the defendant's objection, that the assumptions were consistent with his observations at the victim's home.

The defendant argues that the Martin hypotheticals contained facts not reasonably supported by the evidence. Our review of the record indicates that the Commonwealth's hypotheticals were reasonably based on the evidence. There was evidence of three dime-sized drops of blood that marked the beginning of the blood trail from the kitchen to the bathroom, blood smears along the hall and in the bathroom, the location of the wounds, the fact that the victim's sweatshirt had been torn and stretched around the front of the collar, and the positioning of the defendant's fingerprints on the knife. The victim was found dead in the bathtub, and the murder weapon, a kitchen knife, was on the edge of the bathroom sink.

However, we agree with the defendant that the hypotheticals were improper. First, the questions do not seek an expert opinion, but instead ask for Martin's observations, phrased as expert

opinion. Expert testimony is admissible when the testimony is "beyond the jury's common knowledge and may aid them in reaching a decision." *Commonwealth* v. *Colin C.*, 419 Mass. 54, 60 (1994). "An expert may not, however, offer his opinion on issues that the jury are equally competent to assess, such as the credibility of witnesses." *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982). Martin's observations are not an appropriate subject for an expert question; rather, Martin was asked to perform the jury function of evaluating whether his own testimony was consistent with other testimony. Second, the prosecutor essentially asked Martin to comment on the credibility of the Commonwealth's theory of the case by asking whether its theory was "consistent" with Martin's observations. "On such questions, the influence of an expert's opinion may threaten the independence of the jury's decision." *Id.* Because the objections were preserved, we evaluate them for prejudice, *Commonwealth* v. *Jaime*, 433 Mass. 575, 577 (2001). We determine that the errors were nonprejudicial. "[T]he error[s] did not influence the jury, or had but very slight effect," because of the abundant physical and testimonial evidence against the defendant as to deliberate premeditation and extreme atrocity or cruelty.[8] *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

In contrast, the prosecutor's hypothetical questions to Dr. Weiner were proper. The prosecutor asked Weiner, among other questions, whether the victim's injuries were "consistent with the attacker coming up from behind and being slightly to the right side of the victim and coming in with the knife in . . . a downward fashion." The prosecutor's questions were based on the evidence. They concerned a proper subject of expert testimony, as they asked the qualified witness to express an opinion based on the shape and placement of the wounds. *Simon* v.

---

[8]The defendant contends also that the prosecutor improperly asked Detective Lieutenant Martin's opinion whether the condition of the kitchen indicated that there was a "struggle," because Martin's testimony was not beyond the jury's common knowledge. Passing that there was no objection to the question, the inquiry was not improper. An experienced police officer, or possibly even a lay witness, could opine whether a scene was suggestive of a struggle, just as a lay witness may testify regarding another person's sobriety. Cf. *Holton* v. *Boston Elevated Ry.*, 303 Mass. 242, 246 (1939) ("the principal objective symptoms [of intoxication] are so well known that witnesses have always been permitted to express their opinion as to the inebriety of a person").

*Solomon, supra* ("expert testimony on matters within the witness's field of expertise is admissible whenever it will aid the jury in reaching a decision").

*Closing argument.* The defendant also alleges that the prosecutor, in closing, improperly asked the jury to draw inferences that were not reasonably based on the evidence. In particular, the defendant points to the prosecutor's statements to the jury that the defendant pursued the victim into the bathroom. As there were no objections to these statements at trial, our inquiry is confined to determining if they were improper and, if so, whether they created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Degro,* 432 Mass. 319, 326 (2000).

There was no error. The Commonwealth may "attempt to assist the jury in their task of analyzing, evaluating, and applying evidence. Such assistance includes suggestions by counsel as to what conclusions the jury should draw from the evidence. Counsel may 'fit all the pieces of evidence together so that they form a comprehensive and comprehensible picture for the jury.' " *Commonwealth* v. *Corriveau,* 396 Mass. 319, 336 (1985), quoting *Commonwealth* v. *Ferreira,* 381 Mass. 306, 316 (1980). The prosecutor's portrayal of the defendant pursuing the victim into the bathroom was a reasonable inference from the evidence; there is evidence that, at some point, the defendant followed the victim into the bathroom, as the knife, with the defendant's fingerprints, was found in the bathroom sink.

*Jury instructions.* The defendant contends that the judge erred in declining defense counsel's request to instruct the jury on possible verdicts of voluntary manslaughter under a theory of heat of passion induced by reasonable provocation or by sudden combat and of involuntary manslaughter. The defendant's trial counsel requested and received an instruction on self-defense. The judge also gave an instruction on voluntary manslaughter based on a theory of excessive force in self-defense.

A manslaughter instruction is given when "any view of the evidence will permit a finding that the offence is manslaughter and not murder." *Commonwealth* v. *Brown,* 387 Mass. 220, 227 (1982), quoting *Commonwealth* v. *LePage,* 352 Mass. 403, 419 (1967). Manslaughter is "the taking of human life by an act not justified in law, but without malice aforethought which is neces-

sary to constitute murder." *Commonwealth* v. *Campbell*, 352
Mass. 387, 396-397 (1967). Voluntary manslaughter is defined
as a killing committed in "a sudden transport of passion or heat
of blood, upon reasonable provocation and without malice, or
upon sudden combat." *Id.*, quoting *Commonwealth* v. *Bouvier*,
316 Mass. 489, 494 (1944). "Sudden combat" is "one of the
events which may provoke the perturbation of mind that can
end in a killing without malice." *Commonwealth* v. *Peters*, 372
Mass. 319, 324 (1977). Voluntary manslaughter may be based
on a theory of the excessive use of force in self-defense. *Commonwealth* v. *Walden*, 380 Mass. 724, 729 (1980), citing *Commonwealth* v. *Kendrick*, 351 Mass. 203, 211-212 (1966).

The jury must be able to infer that a "reasonable person
would have become sufficiently provoked and that, in fact, the
defendant was provoked." *Commonwealth* v. *Garabedian*, 399
Mass. 304, 313 (1987). Furthermore, "[a] verdict of voluntary
manslaughter requires the trier of fact to conclude that there is a
causal connection between the provocation, the heat of passion,
and the killing." *Id.*, quoting *Commonwealth* v. *Schnopps*, 383
Mass 178, 180-181 (1981), *S.C.*, 390 Mass. 722 (1984).

The evidence does not warrant a finding of reasonable
provocation.[9] Construing the evidence in the light most favorable to the defendant, *Commonwealth* v. *Schnopps*, *supra* at
179, in the defendant's version of the encounter, he told the victim that the victim hurt his mother, and the victim responded by
saying, "I'll hurt you." Insults and arguments are insufficient
provocation for manslaughter. *Commonwealth* v. *Dustin*, 391
Mass. 481, 487, cert. denied, 469 U.S. 844 (1984). The defendant admitted to the police that the victim did not attack him
with the knife, but claimed that the victim pushed him hard
enough to cause the defendant to strike his back against the
refrigerator or some object and bruise him. Physical contact
between a defendant and a victim is not always sufficient to
warrant a manslaughter instruction, even when the victim initi-

---

[9]There is a similar lack of evidence to warrant instructions on self-defense
and on voluntary manslaughter based on the excessive use of force in self-defense, and the judge need not have given these instructions. Any error,
however, was harmless. The defendant received more than that to which he
was entitled. *Commonwealth* v. *Curtis*, 417 Mass. 619, 632 (1994).

ated the contact. *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973) ("It is an extravagant suggestion that scratches [inflicted by the victim on the defendant's face] could serve as provocation for a malice-free but ferocious attack by the defendant with a deadly instrument"). The alleged push against the refrigerator could not have roused "in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and . . . actually . . . produce such a state of mind in the defendant." *Commonwealth* v. *Walden, supra* at 728. The defendant did not testify at trial, and his statement to the police does not appear to explain how the argument became physical or how a knife became involved. The police found no marks on the defendant other than on the right side of his neck, and saw no sign of a struggle in the house. "The jury could not be permitted merely to speculate on whether the defendant in the course of the struggle might have been roused to the heat of passion." *Id.*

We similarly discern no evidence to warrant an instruction on involuntary manslaughter. Involuntary manslaughter is "an unlawful homicide, unintentionally caused (1) in the commission of an unlawful act, malum in se, not amounting to a felony nor likely to endanger life . . . , or (2) by an act which constitutes such a disregard of probable harmful consequences to another as to constitute wanton or reckless conduct" (citation omitted). *Commonwealth* v. *Campbell, supra* at 397. The defendant requested that the judge instruct the jury on involuntary manslaughter under two theories, either that he killed in the commission of a battery or that he killed by an act of wanton or reckless conduct and without malice. When it is obvious "that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required." *Commonwealth* v. *Fryar*, 425 Mass. 237, 249, cert. denied, 522 U.S. 1033 (1997), quoting *Commonwealth* v. *Pierce*, 419 Mass. 28, 33 (1994). The defendant stabbed the victim twice with a knife. These injuries to the victim's chest and abdomen were deep and fatal, creating "a plain and strong likelihood that death would follow," *Commonwealth* v. *Sires*, 413 Mass. 292, 303 (1992), and as such, do not warrant an instruction regarding a lesser offense.

*General Laws c. 278, § 33E.* The defendant asks that we exercise our power under G. L. c. 278, § 33E, to order a new trial or direct the entry of a verdict of a lesser degree of guilt if the conviction for murder in the first degree is not reversed. We see no basis for doing so.

*Judgments affirmed.*