**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 12-6172

LUTHER JAMES FORD,

             Petitioner – Appellant,

        v.

WARDEN ROBERT M. STEVENSON, III, Broad River Correctional
Institution,

             Respondent – Appellee,

        and

SOUTH CAROLINA, STATE OF,

             Respondent.

Appeal from the United States District Court for the District of
South Carolina, at Aiken.   David C. Norton, District Judge.
(1:11-cv-00775-DCN)

Argued:  January 29, 2013          Decided:  April 3, 2013

Before TRAXLER, Chief Judge, and GREGORY and SHEDD, Circuit
Judges.

Affirmed by unpublished opinion.  Judge Shedd wrote the opinion,
in which Chief Judge Traxler and Judge Gregory joined.

**ARGUED:** Katie A. Croghan, UGA APPELLATE LITIGATION CLINIC,
Athens, Georgia, for Appellant.  James Anthony Mabry, OFFICE OF
THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South

Carolina, for Appellee.  **ON BRIEF:** Peter B. Rutledge, Rory A. Weeks, UGA APPELLATE LITIGATION CLINIC, Athens, Georgia, for Appellant.  Alan Wilson, Attorney General, John W. McIntosh, Deputy Attorney General, Donald J. Zelenka, Senior Assistant Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

SHEDD, Circuit Judge:

Luther James Ford appeals the dismissal of his 28 U.S.C. § 2254 petition, contending that his attorney was constitutionally ineffective in advising him to plead guilty to voluntary manslaughter. We agree with the district court that Ford's claim is without merit and, accordingly, affirm.

I.

On November 26, 2006, Luther James Ford spent the day with his girlfriend, Patricia Thompson, eventually returning that evening to Thompson's home in Bennettsville, South Carolina.[1] Both had been consuming alcohol that day and, at some point, began arguing. Ford retrieved a knife and stabbed Thompson 39 times, killing her. Ford then rode a bicycle to a nearby house where he told two individuals that he "killed" Thompson or "thought he had killed her." (J.A. 47). Thompson was discovered by police sprawled on her bed with her arms in a defensive posture.

Ford was arrested the following day and subsequently indicted for murder. The State then served Ford with notice that it was seeking a sentence of life without parole (LWOP) because he had a 1979 conviction for voluntary manslaughter.

---

[1] Ford and Thompson had previously lived together, but Thompson had moved out several months earlier because Ford had cut her face.

Under South Carolina's "Two Strikes/Three Strikes" statute, a conviction for voluntary manslaughter is considered a "most serious offense." Two convictions for a "most serious offense" require a sentence of LWOP. S.C. Code Ann. § 17-25-45(A). Prior to trial, the State offered to let Ford plead guilty to voluntary manslaughter and receive a mandatory LWOP.

Ultimately, Ford pled guilty to voluntary manslaughter. During the plea colloquy, Ford admitted that he killed Thompson and did not dispute the State's summary of the killing. The trial judge noted that a competency exam found Ford competent to stand trial and explained the mandatory LWOP sentence he was facing if he pled guilty. During the plea hearing, the following exchange took place:

> THE COURT: Are you entering this plea of your own free will and accord?
>
> MR. FORD: In a way.
>
> THE COURT: All right. If you don't mind explain that to me. Is anybody forcing you to do this?
>
> MR. FORD: No, sir.
>
> THE COURT: Okay, anybody intimidating you or anybody promised you anything?
>
> MR. FORD: No, sir.
>
> THE COURT: If it's any problem, now, tell me about it now.
>
> MR. FORD: No, no problem.

(J.A. 45).

4

Thereafter, the trial judge found that Ford's plea was voluntary and accepted it. Ford, through his counsel, Daniel Blake, apologized to Thompson's family. Blake also informed the trial judge that he had investigated the case thoroughly and explained how they reached the decision to plead guilty:

> Luther and I had had numerous discussions during [the 18 months Ford had been imprisoned prior to the plea]. Always the question was whether or not to go to trial understanding that the end result of loosing [sic] a trial would be the same as it would be today. . . . And I believe, really, because of the prior convictions, it's a mandatory sentence.

(J.A. 48-49). The trial judge then imposed the LWOP sentence.

Thereafter, Ford filed a pro se application for post-conviction relief (PCR) in the Marlboro County Circuit Court. Relevant here, Ford claimed that his counsel was ineffective because he failed to inform Ford that, had Ford gone to trial, he could have requested and possibly received an instruction for the lesser included offenses of voluntary and involuntary manslaughter (the involuntary manslaughter claim). A conviction for involuntary manslaughter would not have carried the mandatory LWOP sentence under South Carolina's recidivist statute.

The PCR Court held an evidentiary hearing on Ford's application. During the hearing, Ford testified that his guilty plea was not knowing and voluntary because he "didn't understand that" he was in court to plead guilty and thought he was in

5

court that day for his trial. (J.A. 68). Ford testified that he "understood" some of the plea process, that "he say I could have went to trial and got a lesser sentence." (J.A. 66). Ford testified that, on the day he pled guilty, Blake "took me back in the room and he shut the door," and told Ford to "sign" a "paper." (J.A. 65). Ford testified that he did not know he was signing a guilty plea. On cross-examination, Ford testified that he "kept telling [Blake] I wanted a trial. He kept telling me that he didn't think I could stand a trial." (J.A. 69). Ford reiterated that he did not know he was in court to plead guilty and that, when he figured that out, "I tried to say something and my voice went away." (J.A. 70).

Contrary to Ford's testimony, Blake testified that he talked "extensively" with Ford from November 2006 through April 2008 when Ford pled guilty. (J.A. 72). Blake stated that Ford decided to plead guilty because "he was literally embarrassed. He didn't want to go to trial due to his embarrassment." (J.A. 72). Blake recounted that at one point Ford said he just wanted the death penalty, and that he vacillated between whether to plead and just be done with the process or to fight at trial. Blake said that Ford knew that a conviction would carry at least LWOP and that the State's case was strong because Ford had told one witness that he had killed Thompson and told another witness that he thought he had killed her. Blake also testified that he

6

spoke with family members about the decision to plead guilty and that Ford knew that he was in court to plead guilty and that the decision had been made "in the weeks and months before." (J.A. 74). Blake further testified that Ford had been found competent to stand trial and fully understood how strong the State's case against him was. In Blake's view, "I don't see how we could have won the case." (J.A. 77). Although Ford's PCR application accused Blake of ineffective assistance for failing to inform him of the possibility of an involuntary manslaughter instruction at trial, neither Ford nor Blake was questioned or provided testimony on this point.

The PCR Court denied Ford's application. The PCR Court found Ford's testimony "not credible," and found Blake's testimony "credible." (J.A. 85). The PCR Court likewise found Blake "conducted a proper investigation," "adequately conferred" with Ford, and was "thoroughly competent." (J.A. 85). The PCR Court found that Ford's plea was knowing and voluntary and that Ford knew he would receive an LWOP sentence if he pled guilty. The PCR Court found that Blake informed Ford of the consequences of a plea and "specifically finds credible plea counsel's testimony that they had discussed this very issue." (J.A. 86).

The PCR order does not specifically discuss the availability of the involuntary manslaughter instruction if Ford had gone to trial. However, the order does provide that "any

7

and all allegations that were raised in the application or at the hearing . . . and not specifically addressed in this Order," were "waived" and Ford "failed to meet his burden of proof" on those allegations because Ford failed to present evidence supporting them.[2]  (J.A. 87).  Ford appealed the PCR Court's denial of his application to the South Carolina Supreme Court, raising the involuntary manslaughter claim.  The South Carolina Supreme Court denied certiorari on all of Ford's claims.

Ford next filed a pro se petition for habeas corpus under 28 U.S.C. § 2254 in the District of South Carolina.  Ford's petition raised four claims, including the involuntary manslaughter claim.  After the State moved for summary judgment, the petition was referred to a magistrate judge, who issued a Report and Recommendation, recommending the grant of summary judgment to the State.  The magistrate judge concluded that Ford was not procedurally barred from bringing the involuntary

---

[2]  Contrary to Ford's argument, this resolution clearly counts as an "adjudication on the merits in State court" of Ford's claim under 28 U.S.C. § 2254(d).  See Johnson v. Williams, -- S.Ct. --, 2013 WL 610199, *7 (2013) (noting presumption that "the federal claim was adjudicated on the merits" when the claim is "reject[ed]" without being expressly addressed); Harrington v. Richter, 131 S.Ct. 770, 784-85 (2011) ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

8

manslaughter claim, but that the claim failed on the merits because Ford would not have been entitled to an involuntary manslaughter charge under South Carolina law. The district court, conducting a de novo review, adopted the Report. This court granted Ford a certificate of appealability on the involuntary manslaughter claim, and we now affirm.

## II.

"We review de novo the district court's decision to deny [Ford's] § 2254 petition based on the record before the [state court], applying the same standards as did the district court." Golphin v. Branker, 519 F.3d 168, 178 (4th Cir. 2008). "Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), the scope of our review in cases on collateral review from a state court proceeding that adjudicated a claim on the merits is both deferential and highly constrained." Id. That is, under § 2254, federal habeas relief may not be granted unless a petitioner shows that the earlier state court's decision "was contrary to" clearly established federal law, § 2254(d)(1); or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). In cases alleging ineffective assistance of counsel, the Supreme Court recently reminded lower courts that, even without § 2254's deference, the

9

*Strickland v. Washington*, 466 U.S. 668 (1984), standard "is a most deferential one." *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011). Moreover, "[w]hen combined with the extra layer of deference that § 2254 provides, the result is double deference and the question becomes whether 'there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.'" *Johnson v. Sec'y, DOC*, 643 F.3d 907, 910–11 (11th Cir. 2011) (quoting *Harrington*, 131 S.Ct. at 788). Indisputably, "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Id.* at 911.

On appeal, Ford argues that Blake was ineffective for failing to advise him that, had Ford gone to trial, he was "likely entitled" to an involuntary manslaughter charge. (Appellant's Br. at 26). "To prevail on a claim of ineffective assistance of counsel, a petitioner ordinarily must satisfy both parts of the two-part [*Strickland*] test," *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012), by showing that "counsel's representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,"

10

*Strickland*, 466 U.S. at 694. If Ford fails to make this showing on either prong, our inquiry ends. *Strickland*, 466 U.S. at 697 (noting "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one").

In South Carolina, "[i]nvoluntary manslaughter is the killing of another without malice and unintentionally while engaged in either: (1) an unlawful act not amounting to a felony and not naturally tending to cause death or great bodily harm; or (2) a lawful act with reckless disregard for the safety of others." *State v. Reese*, 633 S.E.2d 898, 900 (S.C. 2006). It is "a lesser included offense of murder only if there is evidence the killing was unintentional." *Tisdale v. State*, 662 S.E.2d 410, 412 (S.C. 2008). "If there is any evidence warranting a charge on involuntary manslaughter, then the charge must be given." *Reese*, 633 S.E.2d at 900.

Ford contends that there is evidence in the record supporting his claim that Thompson's death was unintentional and was the result of engaging in a lawful act with reckless disregard for the safety of others. He relies primarily on three cases—*State v. Light*, 664 S.E.2d 465 (S.C. 2008), *State v. Crosby*, 584 S.E.2d 110 (S.C. 2003), and *State v. Burriss*, 513 S.E.2d 104 (S.C. 1999). In each case, the defendant shot and killed someone with a handgun. Moreover, each defendant

11

testified that he did not mean to shoot the gun—either because it went off during a struggle (Light), while the defendant was getting up off the ground (Burriss), or accidentally while the defendant's eyes were closed (Crosby). Analogizing to these cases, Ford argues that there is no evidence he intentionally wielded the knife, and that in his habeas petition he alleges that Thompson drew the knife on him. Ford also points to evidence that he told one witness that he was not sure if he had killed Thompson and that he and Thompson had been drinking on the day of the murder.

Even assuming this "evidence" was properly before the PCR court,[3] Ford was not prejudiced by Blake's alleged failure to inform Ford that he could pursue an involuntary manslaughter charge at trial because he was not entitled to an involuntary manslaughter charge. First, none of this evidence suggests that Thompson's death was accidental or unintentional. Instead, the record evidence indicates that Ford was drinking on the day of the murder and that he spoke to two people after killing Thompson. In addition, when Thompson's body was discovered, her hands were raised in a defensive posture. In South Carolina, "voluntary intoxication . . . is never an excuse for or defense

---

[3] Ford's suggestion that Thompson held the knife first does not appear in his state court filings and was not introduced during the PCR hearing.

12

to crime," State v. Vaughn, 232 S.E.2d 328, 330 (S.C. 1977), and, in cases of murder, "[v]oluntary intoxication does not impair a person's ability to act with malice aforethought so as to reduce murder to voluntary manslaughter." State v. Davis, 298 S.E.2d 778 (S.C. 1983). Thus, Ford's voluntary drinking is not evidence supporting a voluntary manslaughter charge, yet alone a charge of involuntary manslaughter. Regarding Ford's confessions, he told one witness that he had killed Thompson and another that he "thought" he had killed her. Neither statement suggests that Thompson's death was accidental. In addition to this record evidence, in his habeas petition Ford suggests that Thompson had the knife first. This "evidence" again does not suggest that Ford accidentally stabbed Thompson.

Moreover, missing from Ford's "evidence" is any assertion that, at the time Ford entered his guilty plea, he had told Blake that the stabbing was unintentional or accidental, or provided Blake with any information that would have suggested Thompson's death was involuntary manslaughter. At the PCR hearing, Blake testified only that Ford told Blake, after Ford's memory returned, that he remembered stabbing Thompson. This admission, coupled with Ford's confession to two witnesses and

13

the physical evidence do not suggest the crime of involuntary manslaughter.[4]

Second, Ford's argument is legally unsound. In each case Ford relies upon, a <u>single</u> gunshot was fired during a struggle or altercation, raising at least a plausible inference that the firearm was not intentionally wielded. In contrast, the South Carolina Supreme Court has held that involuntary manslaughter charges are not available in cases where defendants intentionally wielded a weapon but claimed to be aiming at something else. See <u>State v. Cooney</u>, 463 S.E.2d 597, 600 (S.C. 1995) (no involuntary manslaughter charge "when the defendant admitted intentionally firing the gun, but claimed he only meant to shoot over the victim's head"); <u>Harris v. State</u>, 581 S.E.2d 154, 156 (S.C. 2003) (no error in failing to charge involuntary manslaughter where defendant claimed he was only firing warning shots); <u>Douglas v. State</u>, 504 S.E.2d. 307, 310 (S.C. 1998) (same); <u>State v. Smith</u>, 446 S.E.2d 411, 412-13 (S.C. 1994) (no error in failing to charge involuntary manslaughter when defendant was intentionally wielding a knife but did not mean to harm the victim). In addition, the "any evidence" standard Ford cites does not require a charge on a lesser-included offense

---

[4] In fact, there is no evidence that Ford has ever asserted to anyone that Thompson's death was unintentional or accidental.

14

unless the "evidence presented" would "allow a rational inference the defendant was guilty only of the lesser offense." State v. Geiger, 635 S.E.2d 669, 673 (S.C. Ct. App. 2006). See also State v. Gilmore, 719 S.E.2d 688, 693 (S.C. Ct. App. 2011) (noting when the evidence supporting the lesser-included offense is circumstantial, an instruction is warranted if the evidence would "permit a reasonable inference that the defendant is guilty only of the lesser crime"). Thus, "it is not error to refuse to submit a lesser included offense unless there is testimony tending to show that the defendant is only guilty of the lesser offense." State v. Funchess, 229 S.E.2d 331, 332 (S.C. 1976) (emphasis in original); Suber v. State, 640 S.E.2d 884, 886-87 (S.C. 2007) (finding evidence was "insufficient" to support claim that defendant was guilty only of lesser included offense because evidence suggested only that defendant may have been not guilty of the greater offense).

In this case, even taking Ford's "evidence" at face value, he stabbed Thompson 39 times. The line of cases for "accidental" or "unintentional" discharge of a firearm do not suggest that an involuntary manslaughter charge would be required in such circumstances. Instead, it seems clear as a matter of law that, when a defendant stabs a victim 39 times, the wielding of the knife was intentional. Put another way, stabbing someone 39 times, without more, precludes the "rational

15

inference" that the knife was unintentionally wielded. Indeed, we have been unable to find any case in which a victim was stabbed more than one time and an involuntary manslaughter charge was required. See, e.g., Commonwealth v. Burgess, 879 N.E.2d 63, 78-79 (Mass. 2008) (no error in failing to instruct on involuntary manslaughter where victim had two deep stab wounds); State v. Mason, 272 S.W.3d 257, 260-62 (Mo. Ct. App. 2008) (four stab wounds); State v. Carey, 558 S.E.2d 650, 662 (W.Va. 2001) ("There is simply no credible argument that a death which results from the brutal delivery of three fatal stab wounds . . . is accidental"); Ohio v. Campbell, 630 N.E.2d 339, 349-50 (Ohio 1994) (upholding trial court's refusal to give involuntary manslaughter instruction when evidence showed four separate stab wounds in vital areas).

Because Ford would not have been entitled to an involuntary manslaughter charge had he gone to trial, the PCR court did not unreasonably apply Strickland in denying Ford's petition. Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996) ("However, if there exists no reasonable probability that a possible defense would have succeeded at trial, the alleged error of failing to disclose or pursue it cannot be prejudicial.").

III.

For the foregoing reasons, the district court's denial of Ford's § 2254 petition is affirmed.

AFFIRMED