## COMMONWEALTH vs. RALPH NESBITT.

Bristol. April 10, 2008. - August 18, 2008.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Capital case, Confrontation of witnesses. *Constitutional Law,* Confrontation of witnesses. *Evidence,* Testimonial statement, Spontaneous utterance, Dying declaration, Scientific test. *Deoxyribonucleic Acid.*

Discussion of the two-part inquiry to determine the admissibility in evidence at a criminal trial of an out-of-court statement. [242-244]

Certain statements made by a stabbing victim to an emergency responder during a 911 telephone call, identifying the defendant as the person who had stabbed her, were properly admitted in evidence at trial, where the victim had sustained twenty-three stab wounds only moments before the call and had reacted to that extraordinarily startling event by dialing 911 to plead for help [244-246]; further, such statements were not testimonial, where they were primarily aimed at enabling police assistance to meet an ongoing emergency [246-248].

A statement made by a stabbing victim to a neighbor while the victim was mortally wounded and pleading for help was admissible at trial as a spontaneous utterance, where the circumstances in which the statement was made fully supported the conclusion that it was the product of a startling event and not the result of conscious reflection [248-249]; further, the statement, in which the victim described the cause and circumstances of her stabbing and did so fifteen minutes before she died, was properly considered a common-law dying declaration and was thus properly admitted regardless of whether it was testimonial in nature [249-252].

The admission in evidence at a criminal trial of certain inconclusive deoxyribonucleic acid evidence, even if error, did not create a substantial likelihood of a miscarriage of justice, where the weight of the evidence was thoroughly and effectively challenged on cross-examination by defense counsel, and where even the prosecutor in his closing argument stated that the evidence was inconclusive. [252-255]

INDICTMENTS found and returned in the Superior Court Department on January 22, 2004.

The cases were tried before *Gary A. Nickerson,* J.

*Stewart T. Graham, Jr.,* for the defendant.

*Craig A. Souza,* Assistant District Attorney, for the Commonwealth.

CORDY, J. At 11:58 P.M. on October 1, 2003, Dawne Brault

dialed 911 from her home in Attleboro, exclaiming "Oh, God. Hurry up and help me." When the police dispatcher asked Brault what the problem was, she responded: "(Inaudible) just came into my house and tried to kill me." When asked to repeat who had come into her home, Brault stated, "Ralph Nesbitt." In response to further questions, she told the operator that Nesbitt was gone and pleaded for help to "hurry up. I don't want to die." Paramedics responded to the scene and transported Brault to Sturdy Memorial Hospital where she died ten minutes later of multiple stab wounds to her arms and torso.

On January 22, 2004, a Bristol County grand jury returned indictments against Nesbitt in connection with Brault's murder. Following a five-day trial, a jury found Nesbitt guilty of murder in the first degree on theories of premeditation and extreme atrocity or cruelty. Nesbitt was also found guilty of armed burglary, in violation of G. L. c. 266, § 14.[1]

On appeal, Nesbitt claims that the admission of Brault's out-of-court statements to the 911 operator and to a neighbor who found her lying on the floor of her front hallway, covered in blood, violated his right of confrontation, as protected by the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. He also contends that the Commonwealth's introduction of inconclusive deoxyribonucleic acid (DNA) evidence taken from a bicycle near the scene of the murder created a substantial likelihood of a miscarriage of justice. We affirm the convictions and decline to grant relief pursuant to G. L. c. 278, § 33E.

1. *Background.* We summarize the facts the jury could have found, reserving other facts for discussion in conjunction with specific issues raised. Brault and Nancy Robinson were coworkers and friends. They confided in each other as they weathered turmoil in their personal lives. In the autumn of 2003, Brault was in the process of separating from her husband, Michael Brault (Michael). Robinson recently had broken off a seventeen-year relationship with Nesbitt, who was the father of Robinson's five children. In connection with their breakup, Robinson had obtained a protective order against Nesbitt.

---

[1] The Commonwealth nol prossed a third indictment charging armed assault in a dwelling.

Nesbitt blamed Brault for "ruining [his] relationship" with Robinson, and told Robinson that "one day [Brault will] get hers." Approximately four months before the murder, Nesbitt and a friend, William Ambers, visited Brault's home. Ambers drove Nesbitt to the home and parked in the driveway, while Nesbitt went around the house, peeking into its windows. Brault's husband came to the door, and they engaged in a brief conversation regarding the whereabouts of Brault and Robinson. As Ambers drove away, Nesbitt stated his intention to "do something to fix that girl," referring to Brault.

In September, 2003, Nesbitt was living in Brockton, but on the evening of October 1, he traveled to Attleboro. At approximately 8 P.M. that evening, he was dropped off at 15 Mechanic Street, the location of Robinson's apartment, to visit his children.[2] Robinson left the apartment when Nesbitt arrived, and set out in her automobile to visit Brault.

On her way, Robinson stopped at a coffee shop a short distance from 15 Mechanic Street to visit David Jorgensen, who worked as a baker there. Jorgensen was dating Brault at the time and was a friend of Robinson. As Robinson was speaking with Jorgensen, Nesbitt walked past the shop with one of their children. Nesbitt waited for Robinson to leave the shop and then confronted her, asking, "What are you doing with that guy?" Robinson informed Nesbitt that Jorgensen was just "a friend." She then left for Brault's home but told Nesbitt that she was going to pick up her mother from a bingo game.

She arrived at Brault's home at 9 P.M., and remained there until approximately 11 P.M. During that time, Robinson received a telephone call from Nesbitt, who noted that her mother was at home (across the street from 15 Mechanic Street) and asked why Robinson had lied to him. Robinson responded by asking Nesbitt what she was supposed to say, and then refused to tell him "that [she] loved him." At that point in the conversation, Brault laughed audibly.[3]

Robinson then left Brault's home in her automobile, and

---

[2]Nesbitt was not permitted to have personal contact with Nancy Robinson — she characterized their relationship as very violent — and while she had obtained a protective order against him, he was allowed to visit his children.

[3]The evidence is unclear whether Nesbitt heard Brault's laugh, as he did

headed back toward 15 Mechanic Street. She arrived at her apartment at "ten past, quarter past [eleven P.M.]," and immediately called Brault. They spoke for approximately thirty minutes. Ten or fifteen minutes after that conversation — between 11:50 P.M. and midnight, according to Robinson's testimony — she received a call from Nesbitt. He asked her to come outside and speak with him and Robinson responded, "It's twelve o'clock, and I'm not going outside. It's too dark." According to Robinson's testimony, Nesbitt then stated, "That's okay. You don't want to come outside and talk to me? You'll just never see your friend again."[4] Meanwhile, across town (at 147 Wilmarth Street), Brault had just dialed 911.

Just before Brault dialed 911, her cousin and neighbor, Dennis Marcure, was standing in his bathroom and heard something unusual coming from the Brault home.[5] Brault was calling for her son Eric, but she was "crying out" in a way that "sounded strange . . . [un]like her normal voice." Marcure immediately "got dressed . . . and went out to her house." On his arrival, he noticed that the front screen door was covered in a "massive amount of blood," and he quickly found Brault lying "on the floor just covered in blood," with her feet up against the screen door and her body leaning against the storm door in her front hallway. Marcure asked her what had happened and Brault told him, "Ralph did this to me, and don't let me die."

Marcure located Brault's cellular telephone, which was lying underneath her, and also dialed 911. Approximately one minute later, a fire engine drove down the street. The first responders were two emergency medical technicians with the Attleboro fire department, Steven Cutler and his partner, Frank Aussant. Cutler testified that, as he approached the house, he noticed blood "streaking down the door" and that, on further inspection, he

not comment on it. This conversation with Robinson ended immediately thereafter, but he telephoned again a short time later for a brief, five-minute conversation. Robinson did not recall the content of that conversation, and Nesbitt did not testify at trial.

[4] On cross-examination, Robinson admitted that the morning after the murder she told police instead that Nesbitt had said, "You can talk to your friends, but not to me." In her grand jury testimony, Robinson also recalled the conversation in a slightly different way, stating that Nesbitt told her, "You'll never talk to her again."

[5] Marcure testified that his backyard abuts the Braults' backyard.

noticed Brault lying against the door, covered in blood. Cutler took her pulse and tried to determine if she was breathing; when he rolled her over during this process, he noticed that there were a significant number of cuts to her body, which were too numerous to count. Another emergency medical technician who responded to the scene testified that Brault was breathing what is called "agonal breathing, which is just grasping for air," and "looked like she was close to taking her last breath[]."

The medical examiner who performed the autopsy testified that Brault sustained "several different clusters" of stab wounds: four on her left chest, eight on her left shoulder, three on her left breast, and five on her abdomen and the side of her body. She also had one stab wound to her right breast, one on her back, and one on her left arm. Brault suffered twenty-three stab wounds in total, and died as a result.

Subsequent investigation of the crime scene revealed damage to the front doorway consistent with forced entry. The doorjamb was shattered, and part of it was found in the living room, ten to twelve feet away from the front door.[6]

Five hours after the murder, at approximately 5 A.M. on the morning of October 2, 2003, Nesbitt was arrested on Riverbank Road in Attleboro. He was wearing work boots and carrying a hard hat and a hammer. He told the arresting officer that he had been sleeping in the fields by a school, located approximately one and one-half blocks from Robinson's apartment at 15 Mechanic Street, and that he was en route to a construction job.[7] Nesbitt was wearing a gray sweatshirt, and the officer noticed a "brownish reddish spot on the hood of the sweatshirt." Subsequent DNA testing revealed that the DNA profile of the blood on the sweatshirt matched Brault's DNA profile.[8]

---

[6]Despite an extensive search of the area around Brault's residence, the police could not locate the knife used in the stabbing.

[7]One of the detectives assigned to the case testified on redirect examination that the Attleboro police department confirmed that Nesbitt was scheduled to work at a site in Attleboro that morning.

[8]The Commonwealth's DNA expert testified that the "probability of a randomly selected unrelated individual having a DNA profile matching that obtained from the sweatshirt is approximately 1 in 273.6 quadrillion of the Caucasian population, 1 in 2.933 quintillion of the African-American population, and 1 in 265.7 quadrillion of the Hispanic population." Brault was Caucasian.

At trial, the defense highlighted two potential weaknesses of the Commonwealth's case. First, Brault's murder occurred only hours after her husband, Michael, finished moving out of their home at approximately 9:30 P.M. In anticipation of this defense, the Commonwealth called Michael as a witness. He testified that he left some time after 9:30 P.M., and headed to his new apartment. When he arrived there, he quickly fixed himself a sandwich, and then went straight to a local bar, arriving at approximately 10:30 P.M. He spent the evening there in the company of an acquaintance. The Commonwealth introduced the testimony of two bar patrons and the bartender who confirmed that Michael was at the bar between 11 P.M. on October 1 and 1:30 A.M. on October 2, placing him there at the time of the murder.

The second weakness was the potentially conflicting evidence of Nesbitt's whereabouts at the time of the murder. Brault's home at 147 Wilmarth Street was several miles from Robinson's apartment at 15 Mechanic Street. The evidence established Nesbitt's presence at Robinson's apartment until at least 9:15 P.M., and that he lacked an automobile. Nesbitt also called Robinson at approximately midnight, and asked her to "come outside" to speak with him, suggesting that he may have been at 15 Mechanic Street, miles away from the scene of the murder, only moments before or after it occurred. With respect to the latter issue, the Commonwealth introduced evidence that Robinson had a protective order against Nesbitt, and given their "very violent" relationship, Nesbitt had no reason to expect that Robinson would come out of her apartment to see him at midnight, thus suggesting that Nesbitt was lying about his location in his call to Robinson to create a false alibi. The Commonwealth addressed the former issue by introducing in evidence an abandoned bicycle that had been discarded one-quarter mile from the crime scene sometime during the night of October 1 or the early morning hours of October 2, suggesting that Nesbitt rode the bicycle from 15 Mechanic Street to the crime scene and then, after committing the murder, fled, at least initially, on the bicycle.[9]

---

[9]In his closing argument, the prosecutor suggested that Nesbitt abandoned the bicycle and fled on foot when he saw emergency vehicles responding to the crime scene.

Both the left and right handlebars of the bicycle tested positive for the presence of blood. A sample taken from the right handlebar had "insufficient DNA" to conduct an "analysis." A DNA test of the blood sample from the left handlebar yielded "no results," meaning that "very little DNA [was] present" or that it was "very degraded," or both. The Commonwealth's DNA analyst testified that she "was not able to exclude Dawne Brault or Ralph Nesbitt as being potential contributors to this very low level mixture." On cross-examination, the DNA analyst testified that the "probability of a randomly selected unrelated individual having contributed DNA to this mixture is approximately one in one of the Caucasian population, one in one of the African-American population, and one in one of the Hispanic population." The expert then admitted that, like Nesbitt or Brault (or anyone, for that matter), she also could not be excluded as a potential match.

2. *Confrontation clause.* Nesbitt claims that Brault's statements to the emergency responder during her 911 call, and her statements to Marcure shortly thereafter, identifying him (Nesbitt) as the person who stabbed her, were testimonial in nature, and that their admission (over his objection) contravened his right of confrontation as protected by the Sixth Amendment to the United States Constitution and by art. 12 of the Massachusetts Declaration of Rights.[10]

---

[10]The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The right to confrontation is a "bedrock procedural guarantee [that] applies to both federal and state prosecutions." *Crawford* v. *Washington*, 541 U.S. 36, 42 (2004), citing *Pointer* v. *Texas*, 380 U.S. 400, 406 (1965).

The right of a criminal defendant to confront witnesses who testify against him is also protected by art. 12 of the Massachusetts Declaration of Rights, which provides that in a criminal trial "every subject shall have a right to produce all proofs that may be favorable to him [and] to meet the witnesses against him face to face." "Although, in some circumstances, art. 12 may provide a criminal defendant more protection than its Federal counterpart, see *Commonwealth* v. *Amirault*, 424 Mass. 618, 631-632 (1997); *Commonwealth* v. *Bergstrom*, 402 Mass. 534, 541-542 (1988), in cases like this one involving the hearsay rule and its exceptions, we have always held that the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment . . . ." *Commonwealth* v. *DeOliveira*, 447 Mass. 56, 57 n.1 (2006). "Although the defendant refers to art. 12 in his brief, he presents no independent argument that would persuade us to change this view." *Id.* at 58 n.1.

Following the United States Supreme Court's decisions in *Crawford* v. *Washington,* 541 U.S. 36 (2004) (*Crawford*), and *Davis* v. *Washington,* 547 U.S. 813 (2006) (*Davis*), we have held that the admissibility of an out-of-court statement is to be determined by a two-part inquiry. First, the statement must "be evaluated for admissibility under normal evidence rules, i.e., whether it qualifies as a hearsay exception." *Commonwealth* v. *Burgess,* 450 Mass. 422, 431 n.6 (2008). Second, "the statement must be appraised under the criteria of *Crawford-Davis* and *Commonwealth* v. *Gonsalves,* 445 Mass. 1, 3 (2005)[, cert. denied, 548 U.S. 926 (2006)] [*Gonsalves*], to determine if it satisfies the confrontation clause of the Sixth Amendment." *Commonwealth* v. *Burgess, supra.*[11] See *Gonsalves, supra* at 14 ("Whether some out-of-court statements are admissible under exceptions to the hearsay rule does not change whether admitting them would violate the confrontation clause as newly articulated by *Crawford*").

The *Crawford-Davis-Gonsalves* inquiry is itself a "two-step procedure for distinguishing testimonial from nontestimonial statements." *Commonwealth* v. *Burgess, supra* at 429.[12] The first step is to determine whether the statements are testimonial per se. "[S]tatements made in response to questioning by law enforcement agents are per se testimonial, except where the questioning is meant to secure a volatile scene or to establish the need for or provide medical care." *Gonsalves, supra* at 3.

[11]The trial in this case took place in March, 2005, after *Crawford* v. *Washington,* 541 U.S. 36 (2004) (*Crawford*), was decided, but before this Court first interpreted the *Crawford* decision in *Commonwealth* v. *Gonsalves,* 445 Mass. 1 (2005), cert. denied, 548 U.S. 926 (2006) (*Gonsalves*).

In addition, the Superior Court judge did not have the benefit of the United States Supreme Court's decision in *Davis* v. *Washington,* 547 U.S. 813 (2006) (*Davis*), which further defined the boundaries of "testimonial statements" that are inadmissible unless subject to cross-examination. As we held in *Commonwealth* v. *Burgess,* 450 Mass. 422, 430 (2008), "[o]ur rationale in the *Gonsalves* decision is in accord with the Supreme Court's decision in *Davis* . . . ."

[12]That distinction is the heart of the Sixth Amendment analysis because "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Crawford, supra* at 68-69. By contrast, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ." *Id.* at 68.

" '[O]ut-of-court statements made in response to questions from people who are *not* law enforcement agents' and 'statements offered . . . without prompting, regardless of who heard them,' are not testimonial per se" (emphasis in original). *Commonwealth v. Burgess, supra* at 429, quoting *Gonsalves, supra* at 11. Statements that are not testimonial per se must "be examined to determine if they are nonetheless testimonial in fact by evaluating whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting a crime." *Gonsalves, supra* at 3. See *Commonwealth v. Galicia,* 447 Mass. 737, 741 (2006) ("Both *Crawford* and *Davis* counsel that the determination whether a statement is testimonial or nontestimonial for confrontation clause purposes is highly dependent on the context in which the statement was made").

Out-of-court statements deemed testimonial per se or testimonial in fact are inadmissible unless the declarant was "unavailable to testify [at trial], and the defendant had had a prior opportunity for cross-examination," *Crawford, supra* at 54. See *Gonsalves, supra* at 3. Nontestimonial statements, on the other hand, do not give rise to a right of confrontation and may be admitted if the admission is consistent with Massachusetts evidence law. See *Crawford, supra* at 68-69; *Commonwealth v. Galicia, supra* at 745. We consider the statements in turn and conclude that both were properly admitted.

a. *The 911 call.* We set out in the margin the content of Brault's 911 call that was admitted at trial.[13] Before trial, Nesbitt filed a motion to exclude the call. After a hearing, the judge

---

[13]THE DISPATCHER: "Attleboro police, recorded line."

BRAULT: "Oh, God. Hurry up and help me."

THE DISPATCHER: "What's the problem, ma'am?"

BRAULT: "(Inaudible) just came in my house and tried to kill me."

THE DISPATCHER: "Who came in? Hello?"

BRAULT: "Hello. Help me."

THE DISPATCHER: "Are you going to answer my questions so we can? What's your address?"

BRAULT: "147 Wilmarth Street."

THE DISPATCHER: "And who came in?"

BRAULT: "Ralph Nesbitt."

THE DISPATCHER: "And you're at 127 Wilmarth Street?"

ruled that some words were inadmissible (when the dispatcher orders a rescue, opining that "it sounds like it might be a

BRAULT: "Yeah."

THE DISPATCHER: "Do you need a rescue?"

BRAULT: (Inaudible)

THE DISPATCHER: "Hello."

BRAULT: (Inaudible)

THE DISPATCHER: "Do you need a rescue?"

BRAULT: "I need it now."

THE DISPATCHER: "Okay."

BRAULT: "Please hurry."

THE DISPATCHER: "Is he still there?"

BRAULT: "No. Hurry. Hurry up."

THE DISPATCHER: "887 to 3A and 7A."

BRAULT: "Hurry up. (Inaudible)"

THE DISPATCHER: "Start heading to 127 Wilmarth Street, 1-2-7 Wilmarth Street."

THE DISPATCHER: "Ma'am, do you need a rescue?"

BRAULT: "Yes. I need it now."

THE DISPATCHER: "Okay. Stay on the line."

BRAULT: "Oh, he beat the [expletive] out of me."

THE DISPATCHER: "127 Wilmarth Street, I need a rescue. It sounds like it might be a domestic. Okay. They're getting there. 127 Wilmarth."

BRAULT: "147."

THE DISPATCHER: "Okay. Where did he go, ma'am?"

BRAULT: "I don't know."

THE DISPATCHER: "What's your name?"

BRAULT: "Dawne."

THE DISPATCHER: "What's your last name?"

BRAULT: "Brault. Hurry. Hurry."

THE DISPATCHER: "What is your last name?"

BRAULT: "Brault."

THE DISPATCHER: "Spell it for me."

BRAULT: "I can't."

THE DISPATCHER: "Okay. Try to say it a little slower and a little calmer, then."

BRAULT: "I can't talk (inaudible). Oh. Hurry up. I don't want to die."

THE DISPATCHER: "Is he there?"

BRAULT: "Hurry. Please hurry."

THE DISPATCHER: "Yep."

BRAULT: "Oh."

THE DISPATCHER: "Is he still there?"

domestic"), but concluded that the remainder of the call was admissible "as a spontaneous exclamation and as a dying declaration. Under both theories."

We agree that Brault's statements to the 911 operator were properly considered to be spontaneous (or excited) utterances. A statement will be considered a spontaneous utterance "if (1) there is an occurrence or event 'sufficiently startling to render inoperative the normal reflective thought processes of the observer,' and (2) if the declarant's statement was 'a spontaneous reaction to the occurrence or event and not the result of reflective thought.' " *Commonwealth* v. *Santiago*, 437 Mass. 620, 623 (2002), quoting 2 McCormick, Evidence § 272, at 204 (5th ed. 1999). There is no question that Brault made the call "in circumstances that reasonably negated premeditation," *Commonwealth* v. *Santiago*, *supra* at 625, where she sustained twenty-three stab wounds only moments before the call and reacted to that extraordinarily startling event by dialing 911 to plead for help. Her statements, therefore, readily fall within the spontaneous utterances exception to the hearsay rule, *Commonwealth* v. *McLaughlin*, 364 Mass. 211, 221-222 (1973), and Nesbitt does not suggest otherwise.[14]

Our next inquiry, as required by *Crawford*, is whether Brault's statements were testimonial. In *Davis*, *supra* at 822 n.2, the United States Supreme Court considered 911 operators to be "agents of law enforcement when they conduct interrogations of 911 callers" and, for the purposes of that opinion, "consider[ed] their acts to be acts of the police." See *Commonwealth* v. *Galicia*, *supra* at 742 n.11, 744-745 (applying same reasoning). Consequently, we consider Brault's statements to have been made "made in response to questioning by law enforcement agents." *Gonsalves*, *supra* at 3. As such, they should be considered testimonial per se *unless* the "questioning [was] meant to secure a volatile scene or to establish the need for or provide medical care." *Id.* See *Davis*, *supra* at 822 ("Statements are nontestimonial when made in the course of police interrogation

---

BRAULT: "No. Oh."

THE DISPATCHER: "Okay. What kind of injury do you have?"

BRAULT: "I don't know. I don't — I can't — oh."

[14]Brault's statements to the 911 operator might also qualify as a dying declaration. See *infra* at 249-252.

under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency"). The *Davis* Court provided "various inidicia [to] help determine whether the 'primary purpose' of a statement obtained during [this type of police questioning] may be seen as testimonial." *Commonwealth* v. *Burgess, supra* at 428. *Commonwealth* v. *Galicia, supra* at 743-744. These indicia include "(1) whether the declarant was speaking about 'events *as they were actually happening* rather than describ[ing] past events'; (2) whether a reasonable interrogator would recognize that the declarant was facing an 'ongoing emergency'; (3) whether the question[s] and answer[s] were, viewed objectively, 'necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past,' including whether it was necessary for the interrogator to know the identity of the alleged perpetrator; and (4) the 'level of formality' of the interview" (emphasis in original). *Commonwealth* v. *Burgess, supra* at 428, quoting *Davis, supra* at 827. Statements that "are the products of interrogations . . . tend to generate testimonial responses," but "it is in the final analysis the declarant's statements, not the interrogator's questions, that the [c]onfrontation [c]lause requires us to evaluate." *Davis, supra* at 822 n.1.

Turning to the record before us, and considering the indicia set forth in *Davis,* we conclude that Brault's statements are not testimonial per se. As the content of the call indicates, an assault had taken place only moments earlier. Brault was clearly in the midst of an ongoing medical emergency, requesting a rescue "now," stating that she could not spell or talk, and pleading, "Hurry up. I don't want to die." These circumstances are akin to the 911 call in *Davis, supra* at 827, where Brault's "frantic" call was "plainly a call for help against a bona fide physical threat," and to a similar call in *Commonwealth* v. *Galicia, supra* at 745, where the victim's comments described a situation that "any reasonable listener would conclude constituted an ongoing emergency." Cf. *Commonwealth* v. *Burgess, supra* at 431 (statements to police testimonial where scene not dangerous, and victim provided extended answers to officer's inquiries). Here the 911 dispatcher's questions were properly tailored "to determine what

was necessary to resolve the present emergency." *Commonwealth* v. *Galicia, supra* at 745.

Brault's first two statements, "Hurry up and help me" and "[Someone] just came in my house and tried to kill me," also raised the possibility that a violent (and perhaps armed) individual might still have been at the scene. It was therefore necessary for the dispatcher to determine the identity of the perpetrator and to ascertain whether the first responders would be encountering a dangerous situation. His questions ("Who came in?" and "Is he still there?"), viewed objectively, were aimed at resolving the present emergency and not at conducting an investigation of past events. Finally, the dispatcher's questions were responsive to Brault's pleas for help and did not reflect a high level of formality. See *Commonwealth* v. *Galicia, supra* at 745 ("questions occurred in the highly informal setting of a telephone call to a 911 dispatcher").

Consequently, we conclude that Brault's statements to the 911 operator were not testimonial. They were primarily aimed at enabling "police assistance to meet an ongoing emergency," and Brault was "not acting as a *witness*; [nor was she] *testifying*" (emphasis in original). *Davis, supra* at 828. "No 'witness' goes into court to proclaim an emergency and seek help." *Id.* See *Commonwealth* v. *Galicia, supra* at 744 & n.14.

b. *Statement to Marcure.* Brault's statement to Marcure (her neighbor) that "Ralph did this to me . . . don't let me die," would be admissible under Massachusetts evidence law as a spontaneous utterance for the same reasons that her 911 call, placed moments earlier, was a spontaneous utterance.[15] See part 2.a, *supra.* The circumstances of this statement, made when Brault was mortally wounded and pleading for help, fully support the conclusion that it was the product of a "startling" event and not the result of "conscious reflection." *Commonwealth* v. *Santiago,* 437 Mass. 620, 626 (2002).

The statement, while not made to a law enforcement agent,

---

[15]Within moments of arriving, Marcure also placed a 911 call, which Nesbitt sought to exclude from evidence before trial. The judge concluded that Marcure's statements to the 911 operator were inadmissible because they did not constitute a spontaneous utterance, and (implicitly) because they were testimonial in nature.

must still be evaluated to determine whether it was "testimonial in fact." *Gonsalves, supra* at 11, 12. Cf. *Davis, supra* at 822 n.1 ("[We do not] imply . . . that statements made in the absence of any interrogation are necessarily nontestimonial"). "The proper inquiry is whether a reasonable person in [Brault's] position would anticipate the statement's being used against the accused in investigating and prosecuting a crime." *Gonsalves, supra* at 12-13. The gravity of Brault's physical injuries, and the immediate threat posed by those injuries, would likely preclude a reasonable person in her position from anticipating any nonimmediate future event, including a police investigation or a prosecution of the perpetrator. As the 911 call revealed, Brault could barely talk at the time and was incapable of spelling her name or describing her injuries. She, like any person in that position, would have been consumed by the immediacy of the situation and was struggling to communicate. "It is almost inconceivable that, moments after such an event, [someone in Brault's] condition — described as essentially frantic — could have spoken in contemplation of a future legal proceeding." *Commonwealth* v. *Tang,* 66 Mass. App. Ct. 53, 60-61 (2006). In these circumstances, her statement was plainly not testimonial.

However, even if Brault's statement to Marcure were considered to be testimonial in fact, its admission as a "dying declaration" would not, in our view, be contrary to Nesbitt's constitutional right of confrontation. The *Crawford* Court, while expressly leaving the issue undecided, noted that, "[a]lthough many dying declarations may not be testimonial, there is authority for admitting even those that clearly are." *Id.* at 56 n.6. The confrontation clause "is most naturally read as a reference to the right of confrontation at common law, admitting only those [hearsay] exceptions established at the time of the founding." *Crawford, supra* at 54, citing *Mattox* v. *United States,* 156 U.S. 237, 243 (1895). "The existence of [the dying declaration] as a general rule of criminal hearsay law" when the Sixth Amendment was adopted "cannot be disputed." *Crawford, supra* at 56 n.6.

This court reached the same conclusion eighty-five years ago in *Commonwealth* v. *Slavski,* 245 Mass. 405, 413-414 (1923). "The right of one charged with a crime to be confronted by his accusers was not created and introduced as something new in

criminal procedure by this constitutional provision, but an exist-
ing part of the law of the land was thereby secured against
future change except by the people themselves." *Id.* at 414. The
principle of confrontation was "adopted as a constitutional
guaranty, but *with* the well-recognized exceptions which were a
part of the principle and essential to its practical vitality"
(emphasis added). *Id.* Most prominent of those exceptions was
"the admission in evidence of dying declarations . . . [in]
prosecutions for homicide." *Id.* at 415. Indeed such evidence
was readily admitted without objection at the Boston Massacre
Trial (*Rex* v. *Wemms*) in 1770, and noted in the court's instruc-
tion to the jury. See 3 Legal Papers of John Adams 212-214,
307-308 (L. Wroth & H. Zobel eds. 1965).

The language of *Commonwealth* v. *Slavski, supra,* is consis-
tent with *Crawford, supra* at 56 n.6. Other State courts that
have addressed the issue of dying declarations, post-*Crawford,*
agree. See *People* v. *Monterroso,* 34 Cal. 4th 743, 764 (2004),
cert. denied, 546 U.S. 834 (2005); *People* v. *Gilmore,* 356 Ill.
App. 3d 1023, 1033 (2005); *Harkins* v. *State,* 143 P.3d 706, 711
(Nev. 2006). See generally 30B M.H. Graham, Federal Practice
and Procedure § 7033, 58-59, 107-108 (interim ed. Supp. 2008).
The Supreme Court of California discussed the issue in depth
in the wake of *Crawford,* concluding that "if, as *Crawford*
teaches, the confrontation clause 'is most naturally read as a
reference to the right of confrontation at common law . . . 'it
follows that the common law pedigree of the exception for dy-
ing declarations poses no conflict with the Sixth Amendment."
*People* v. *Monterroso, supra* at 765, quoting *Crawford, supra* at
54. See *People* v. *Monterrosa, supra* at 764, quoting *State* v.
*Houser,* 26 Mo. 431, 438 (1858) ("dying declarations, made
under certain circumstances, were admissible at common law,
and that common law was not repudiated by our constitution in
the clause referred to, but adopted and cherished"). See also *Har-
kins* v. *State, supra* ("because dying declarations were recog-
nized at common law as an exception to the right of confronta-
tion, they should continue to be recognized as an exception").

Nesbitt argues to the contrary, citing an unpublished memor-
andum opinion and order of the United States District Court for
the proposition that "there is no rationale in *Crawford* or other-
wise under which dying declarations should be treated differ-

ently than any other testimonial statement. This is so especially since the historical underpinnings of the exception fail to justify it." United States *vs.* Jordan, U.S. Dist. Ct., No. 04-CR-229-B (D. Colo. Mar. 3, 2005). However, that decision focused on whether dying declarations *ought* to be excluded from confrontation clause scrutiny as a matter of policy, rather than addressing whether such statements *are* excluded as a matter of preratification common law. In weighing the merits of *People* v. *Monterroso*, *supra*, against those of United States *vs.* Jordan, *supra*, the Appellate Court of Illinois reached the same conclusion: "We believe that the reasoning of *Monterroso* represents the sensible approach and choose to follow it instead of Jordan. *Crawford* provided an in-depth discussion of the right of confrontation as it existed at the time [of ratification] and offered a strong statement regarding the admissibility of dying declarations. Considering the Supreme Court's guidance on the issue, we are reluctant to expand that right beyond the historical parameters indicated in *Crawford*." *People* v. *Gilmore, supra.* We agree.

As the *Crawford* Court stated, if "the Sixth Amendment incorporates an exception for testimonial dying declarations . . . on historical grounds, it is sui generis." *Crawford, supra* at 56 n.6. Cf. *id.* at 56 ("Most of the hearsay exceptions [at common law] covered statements that by their nature were not testimonial — for example, business records or statements in furtherance of a conspiracy"). Thus, in the unique instance of dying declarations, we ask *only* whether the statement is admissible as a common-law dying declaration, and not whether the statement is testimonial.[16]

In a prosecution for homicide at common law, a statement

---

[16]"Under traditional Massachusetts procedure, the judge and then the jury are to determine whether the requirements for a dying declaration have been established by a preponderance of the evidence." *Commonwealth* v. *Key*, 381 Mass. 19, 22 (1980), citing *Commonwealth* v. *Polian*, 288 Mass. 494, 498-499 (1934). See *Commonwealth* v. *Green*, 420 Mass. 771, 781-782 (1995) (judge must determine by preponderance of evidence that elements of dying declaration are satisfied, and if statement is admitted, judge must then instruct jury that they must also find by preponderance of evidence that same elements are satisfied before they may consider substance of statement). Here the judge initially found that the statement was a dying declaration, and before deliberations the jury were instructed that they must not consider Brault's statement substantively unless they found, by a preponderance of the evidence, that the statement was a spontaneous utterance or a dying declaration.

made by a declarant-victim under the belief of imminent death and who died shortly after making the statement, concerning the cause or circumstances of what the declarant believed to be her own impending death, was admissible as an exception to the rule against hearsay. See *Commonwealth* v. *Polian*, 288 Mass. 494, 497 (1934); *Commonwealth* v. *Vona*, 250 Mass. 509, 511 (1925).[17] Here, Brault's statement satisfies the requisite elements. She was the victim of the homicide; clearly expressed her fear of impending death to Marcure, stating, "I don't want to die" and "[D]on't let me die"; and had just been stabbed twenty-three times. See *Commonwealth* v. *Key*, 381 Mass. 19, 25 (1980), citing *Mattox* v. *United States*, 146 U.S. 140, 151 (1892) ("declarant's sense of impending death may be inferred from the character of [her] injury"). She described the cause and circumstances of her impending death, and did so fifteen minutes before she died. Brault's statement, therefore, may properly be considered a common-law dying declaration, and was properly admitted regardless of whether it was testimonial in nature.

3. *DNA evidence.* Nesbitt also contends that inconclusive DNA evidence from the handlebars of the bicycle was improperly introduced at trial. Because he did not object to its admission, we review the evidence to determine whether it created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Mathews*, 450 Mass. 858, 872 (2008).

The Commonwealth's DNA analyst testified that the blood

---

[17]The dying declaration exception has been expanded beyond the common-law rule as stated in *Commonwealth* v. *Polian*, 288 Mass. 494, 497 (1934), and *Commonwealth* v. *Vona*, 250 Mass. 509, 511 (1925). See M.S. Brodin & M. Avery, Massachusetts Evidence § 8.19, at 560-561 (8th ed. 2007).

For example, in *Commonwealth* v. *Key*, 381 Mass. 19, 26 (1980), this court departed from the common-law rule that "admitted dying declarations only where the declarant's own death is the subject of the homicide indictment," and held that "[w]here multiple homicides result from one felonious act, the dying declaration of one victim should be admitted to prove the homicides of the other common victims." The rule has also been expanded by statute, see G. L. c. 233, § 64 (addressing admissibility of dying declaration of woman whose death results from unlawful abortion).

Because Brault's statement here qualifies under the narrower concept of a dying declaration, see *Commonwealth* v. *Polian*, *supra*, we need not address whether the dying declaration exception implicit in the Sixth Amendment and art. 12 extends to the boundaries of our current, expanded concept of dying declarations.

found on the bicycle's left handlebar yielded "no results," meaning that "very little DNA [was] present" or that it was "very degraded," or both. The expert was able to determine that the blood included DNA from a mixture of "at least three people" but nothing more than that "limited information." She then described her findings by stating: "I was not able to exclude Dawne Brault or Ralph Nesbitt as being potential contributors to this very low level mixture."

In *Commonwealth* v. *Mathews*, *supra* at 871-872, we stated that the admissibility of DNA results, even when those results are inconclusive, should be determined on a case-by-case basis. There, the centerpiece of the defense strategy was a challenge to the "integrity of the police investigation,"[18] including the adequacy of the testing of a large number of blood samples. *Commonwealth* v. *Bowden*, 379 Mass. 472, 485 (1980). We concluded that "[w]hen faced with such a suggestion, the prosecutor is entitled to introduce testimony to demonstrate that [DNA] tests were performed and results (even if inconclusive) were obtained." *Commonwealth* v. *Mathews*, *supra* at 872. Although in the *Mathews* case, "[t]he question whether inconclusive DNA testing results would have been admissible (over objection) had the defendant not questioned the sufficiency of the Commonwealth's investigation" was not before us, *id.* at 872 n.15, we nonetheless set forth a guidepost for future cases: "The issue is primarily one of relevance. 'Generally a trial judge is accorded "substantial discretion in deciding whether evidence is relevant," and whether relevant evidence should be excluded if it is less probative than prejudicial.' *Commonwealth* v. *Talbot*, 444 Mass. 586, 589 n.2 (2005), quoting *Commonwealth* v. *Tobin*, 392 Mass. 604, 613 (1984) . . . . A trial judge's determination of the relevance of DNA test results is no different from other evidentiary decisions, and we will afford that decision substantial deference." *Id.*

The present case is an imperfect vehicle for addressing the issue left unaddressed in *Commonwealth* v. *Mathews*, *supra*. Because defense counsel did not object, the relevance of the

---

[18]See *Commonwealth* v. *Cordle*, 412 Mass. 172, 177 (1992) (holding "failure of the police to conduct certain tests is a permissible ground on which to build a defense").

DNA evidence went largely unexplored.[19] We nevertheless stress here, as we did there, *id.* at 872 n.15, that for inconclusive DNA evidence to be admissible, it must be probative of an issue of consequence in the case. See *Commonwealth* v. *Schuchardt*, 408 Mass. 347, 350 (1990). The testimony regarding inconclusive DNA evidence, when phrased as it was here, was, at a minimum, prejudicial. It suggested to the jury that Nesbitt and Brault were linked to the blood (after all, they "couldn't be excluded" as potential matches), and that this link would be more firmly established if only more blood were available for testing. The reality is quite different: no one — not Nesbitt, not Brault, not even the DNA analyst herself — could be "excluded" as a potential match, because the DNA could have come from anyone. As the DNA expert testified, "[t]he probability of a randomly selected unrelated individual having contributed DNA to this mixture is approximately one in one of the Caucasian population, one in one of the African American population, and one in one of the Hispanic population." Unless that information is probative of some issue of consequence, its value is substantially outweighed by the danger of prejudice and its misleading nature. See *Commonwealth* v. *Bonds*, 445 Mass. 821, 831 (2006).

Even if it were error to permit the introduction of testimony concerning the inconclusive DNA evidence, its admission did not create a substantial likelihood of a miscarriage of justice in

[19]The record reveals that defense counsel exhibited an inclination to challenge the adequacy of the Commonwealth's investigation. At the charge conference, defense counsel requested an instruction pursuant to *Commonwealth* v. *Bowden*, 379 Mass. 472, 485 (1980), noting, inter alia, that although the investigation of the murder revealed blood on the floor of another location in Brault's backyard, that blood was not "sent out for DNA analysis." Although the instruction was denied, defense counsel specifically mentioned the failure to test the blood taken from the shed in his closing argument. Whether defense counsel would have raised the same issue with regard to the blood found on the bicycle cannot be gleaned from the transcript. Thus, there is no telling whether the fact that DNA analysis was performed, even though the results were inconclusive, was probative of an issue in the case. See *Harris-Lewis* v. *Mudge*, 60 Mass. App. Ct. 480, 485 (2004), citing P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 4.1.1, at 108 (7th ed. 1999) ("The concept of relevance has two components: [1] the evidence must have some tendency to prove a particular fact; and [2] that particular fact must be material to an issue in the case").

this case. See *Commonwealth* v. *Mathews, supra* at 872. The weight of the DNA evidence was thoroughly and effectively challenged on cross-examination by defense counsel, and even the prosecutor in his closing argument stated that the DNA was from "such a contaminated sample, it could be you, me, anybody associated with this case, or anybody else."[20]

4. *Conclusion.* We have examined the record pursuant to G. L. c. 278, § 33E, to determine whether there is any basis to set aside or reduce the murder verdict, regardless of whether such grounds were raised on appeal. We conclude that the evidence supported Nesbitt's conviction of murder in the first degree, by reason of premeditation or of extreme atrocity or cruelty, and that there is no basis on which to reduce that verdict or order a new trial.[21]

*Judgments affirmed.*

---

[20]Defense counsel similarly addressed the inconclusive DNA evidence in his closing, noting that given the expert testimony, neither he nor the prosecutor could be excluded as a potential match.

[21]We likewise conclude that Nesbitt's conviction of armed burglary, in violation of G. L. c. 266, § 14, was supported by the evidence.