Cite as 2023 Ark. 54

# SUPREME COURT OF ARKANSAS

**No.** CR–22–433

| | |
|---|---|
| | **Opinion Delivered:** March 30, 2023 |
| SIR JEFFERY MCNEIL-LEWIS<br><div align=right>APPELLANT</div> | APPEAL FROM THE CRITTENDEN COUNTY CIRCUIT COURT [NO. 18CR-21-104] |
| V. | |
| STATE OF ARKANSAS<br><div align=right>APPELLEE</div> | HONORABLE RANDY F. PHILHOURS, JUDGE |
| | AFFIRMED. |

**RHONDA K. WOOD, Associate Justice**

Criminal defendants have the right to confront witnesses against them. McNeil-Lewis contends the circuit court erred by admitting (i) two 911 calls reporting a shooting and (ii) a dash cam video containing statements from an eyewitness. The speakers on the calls and the eyewitness were not present at trial and were unavailable for him to cross-examine. We conclude the 911 calls were properly admitted as nontestimonial statements and conclude any error from the admission of the dash cam video was harmless. The additional issues on appeal were not preserved for our review. We affirm.

## I.  *Factual Background*

Sir Jeffery McNeil-Lewis was charged with first-degree murder, first-degree battery, eight counts of terroristic threatening, and firearm enhancements for each charge. These charges followed a shooting in West Memphis, Arkansas. He was tried on the charges. Testimony from the jury trial showed that the shooting victims—Jarvis Moore and Stacy

Abram—had been doing electrical work in a vacant house. They had taken their lunch break on the front porch when two men started shooting at them from across the street. Moore suffered a gunshot wound to the head and died a short time later at the hospital. Abram suffered a gunshot wound to his arm but survived. Abram later identified McNeil–Lewis as one of the shooters.

The police apprehended McNeil–Lewis at the scene; additional evidence connected him with the shooting. Police recovered guns from a house across the street owned by McNeil–Lewis's sister. Witnesses had seen McNeil–Lewis leaving this house. These guns matched the shell casings found at the crime scene and the bullet recovered from Jarvis Moore's head. Gunshot residue was found on McNeil–Lewis's hands.

Along with this evidence, the State presented evidence from witnesses absent from trial: two 911 calls and a video from a police dash camera. The video showed statements from Aaliyah Perry, an eyewitness. But Perry never appeared at trial because the State failed to serve her with the subpoena. The defense argued the evidence violated McNeil–Lewis's right to confrontation and that the statements were inadmissible hearsay. The court nevertheless admitted the video.

Lillian Blazin, patrolwoman at the West Memphis Police Department, testified about the events surrounding the video. Officer Blazin arrived at the crime scene a few minutes after she had been dispatched. Officer Blazin started "asking questions because there was a rather large crowd," and encountered Aaliyah Perry, who told Blazin that she'd seen "the whole thing." Officer Blazin said Perry appeared shaken: "She was terrified. She was

2

absolute [sic] petrified. She was shaking." Officer Blazin then took Perry to her patrol car, and their conversation continued while Perry sat in the back seat.

Perry told Officer Blazin that "there was one fat man and one skinny guy that had done the shooting." Officer Blazin told Perry that she would need to go to the station to give a statement, got more background information from Perry, and then closed the door to the patrol car. A few seconds later, Perry quickly knocked on the patrol car window as the police were clearing people from the crime scene. According to Officer Blazin's testimony at trial, Perry identified McNeil-Lewis as the shooter. This is the part of the exchange between Perry and Officer Blazin from the patrol car:

BLAZIN: I'm going to run here real quick and see if they've got something. Okay. What's your name, baby?

PERRY: Aaliyah Perry.

BLAZIN: Okay. Phone number and address, one in Arkansas.

PERRY: Oh, my gosh.

BLAZIN: All right. What's your name?

PERRY: Aaliyah Perry.

BLAZIN: Aaliyah Perry, Aaliyah Perry. What's your birthday?

PERRY: May 30, 2002.

BLAZIN: 5/30/02, 5/30/02. All right. Baby, I'm going to place you in our – – you're not in trouble. You're good. Just breath. [sic] Okay. Try and think of anything and everything. Okay. All right. Yeah, she will. She's going to have to give a statement.

[*Ed. note:* Perry quickly knocks on patrol-car door]

PERRY: I think that's him.

BLAZIN:     Huh?

PERRY:      I think that's him.

BLAZIN:     Who?

PERRY:      The guy.

BLAZIN:     Which ones?

PERRY:      Oh, man.  It is him.  The big dude.

SPEAKER:    [Indiscernible.]

PERRY:      It is him.

SPEAKER:    The one the detective is with?

PERRY:      It is him.  It's the big dude.

BLAZIN:     Which one?  Which one?

PERRY:      Both of them.

BLAZIN:     That my partners are talking to[]?

PERRY:      Yes.

BLAZIN:     5944, my witness is saying that the big one was probably involved.

PERRY:      No, he was.  They ran into this house.

BLAZIN:     Ok. I gotcha, baby.  Don't get her out of the car.  She can stay in there.  What have you got, McPhearson?  Oh, I thought you were McPhearson.  What do you need, sir?  I thought that was Nick.  It's Cap.  He said he's okay.

            Was it both of them?

PERRY:      Yes.

BLAZIN:     Which one?

PERRY:      The one in the white.  Wait, I want to make sure.  I think the one with the white shirt [indiscernible].  I know it was a small dude.  I know it was that big guy because they both right here.

4

| | |
|---|---|
| BLAZIN: | Okay. So it was the big one and then which one? |
| PERRY: | I don't know. Because I know [indiscernible] the one in the white shirt. |
| BLAZIN: | You think it was the one in the white shirt? |
| PERRY: | White shirt and they both had guns. |

Officer Blazin relayed this information to the other officers, who arrested both McNeil-Lewis and the alleged accomplice.

The jury ultimately returned a guilty verdict on all counts. The case then went to a sentencing hearing. Neither side presented witnesses, but both gave closing arguments. The jury sentenced McNeil-Lewis to life imprisonment plus fifteen years. Several weeks later, McNeil-Lewis filed a motion for a mistrial alleging a juror had failed to disclose being related to someone in law enforcement. The circuit court never ruled on the motion, which was deemed denied. McNeil-Lewis now appeals from the convictions and this deemed-denied motion.

## II. *Law and Analysis*

### A. Confrontation Clause and Hearsay

McNeil-Lewis challenges the admission of the 911 calls and admission of the dash cam video. He argues all were inadmissible hearsay and violated his right to confront witnesses against him. As to the 911 recordings, we hold that the hearsay argument wasn't preserved and that the recordings were admissible under the Confrontation Clause as nontestimonial statements. As to the dash cam video, we conclude its admission was harmless error.

Hearsay statements are admissible against a defendant in a criminal trial when two conditions are met. First, the statement must fall under a hearsay exception; second, the statement cannot violate the defendant's Sixth Amendment right to confront witnesses against him. *Seely v. State*, 373 Ark. 141, 145, 282 S.W.3d 778, 782 (2008). We review the constitutional question about the Confrontation Clause de novo. *Id.*

The Confrontation Clause analysis begins with the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004). There, the Court held "testimonial" hearsay was inadmissible in criminal cases except when the witness was unavailable and when the declarant had a prior opportunity for cross-examination. *Id.* at 68. The Court "left for another day" what evidence counted as testimonial, but concluded it included "at a minimum . . . prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogation." *Id.*

The Court clarified the definition of "testimonial" in *Davis v. Washington*, 547 U.S. 813 (2006). That case consolidated two appeals—*Davis* itself and *Hammon v. Indiana*. *Davis* asked whether a 911 call counted as testimonial; *Hammon* asked the same question about a victim's affidavit signed shortly after police responded to a domestic-violence call. *Id.* 817–21. To resolve these questions, the Court created a "primary purpose" test to distinguish between nontestimonial and testimonial statements:

> Statements are ***nontestimonial*** when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.
>
> They are ***testimonial*** when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822.

Applying this test, the Court concluded the 911 call in *Davis* was nontestimonial because the declarant was describing "events as they were actually happening, rather than describing past events"; because questions from 911 dispatch were intended to "resolve [a] present emergency"; and because the encounter took place in an informal setting when the declarant was giving "frantic answers . . . over the phone in an environment that was not tranquil or . . . safe." *Id.* at 827. In *Hammon*, on the other hand, the Court concluded the affidavit was testimonial because, when the statement was obtained, the declarant told the police that "things were fine . . . and there was no immediate threat to her person." *Id.* at 830. The police, at that time, were not trying to find out "what is happening, but rather what happened." *Id.*

### 1. *911 calls*

As to these 911 calls, we first hold that McNeil–Lewis failed to preserve his argument that the circuit court abused its discretion when it admitted this evidence as an exception to hearsay. Below, defense counsel objected only on the Confrontation Clause, relevance, and that the evidence was substantially more prejudicial than probative. "An appellant may not change the grounds for his argument on appeal and is instead limited to the scope and nature of the objections presented at trial." *Stover v. State*, 2017 Ark. 66, at 5, 511 S.W.3d 333, 335. We address only his Confrontation Clause argument asking whether the 911 calls were testimonial or nontestimonial.

These calls are sufficiently like the facts in *Davis*. The statements described events as they were happening. In the first call, the declarant frantically asks the 911 dispatcher to

send an ambulance because a man had been shot and was lying on the ground. In the second call, the declarant repeated the same information about a man having been shot and that shots were being fired. These statements reported a shooting injury and described present events. We affirm the circuit court's ruling that these statements were nontestimonial because, when viewed objectively, their primary purpose was to seek police assistance for an ongoing emergency.

### 2. *Dash cam video*

As to the dash cam recording, even if the video had been improperly admitted, we still have no basis to reverse and remand for a new trial.[1] The erroneous admission of hearsay does not justify reversal when the error was harmless. *Proctor v. State*, 349 Ark. 648, 668, 79 S.W.3d 370, 383 (2002). Confrontation Clause violations also receive harmless-error analysis. *Roston v. State*, 362 Ark. 408, 410, 208 S.W.3d 759, 760 (2005) (citing *Delaware v. Van Arsdall*, 475 U.S. 673 (1986)). That analysis includes several factors: (i) whether the statement was important to the prosecution's case; (ii) whether the statement was cumulative; (iii) whether other testimony corroborated or contradicted the statement; (iv) whether cross-examination was otherwise extensive; and (v) whether the prosecution's case was strong overall. *Id.* Applying those factors here, we conclude the admission of the dash cam video was harmless error beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 681 (noting conviction should not be set aside if constitutional error is harmless beyond a reasonable doubt).

---

[1] *See, e.g.*, *Lewis v. State*, 2023 Ark. 12, at 18 (affirming based on harmless error after assuming the evidence had been improperly admitted).

First, while the statement was important to the prosecution's case as it involved an identification of the defendant, the statement was cumulative to other eyewitness testimony. Stacy Abram, one of the victims, also identified McNeil-Lewis both by a photo-identification lineup shortly after the shooting and then at trial. Second, Perry's identification was relayed through Officer Blazin's testimony; that is, one reason the jury knew that Perry had identified McNeil-Lewis was through Officer Blazin's subsequent elaboration at trial. And Officer Blazin was subject to cross-examination by the defense. This examination included questions about the relation of the patrol car to the crime scene; whether the windows were tinted; whether the crowd could have obstructed Perry's view; and other questions meant to test the accuracy of Perry's identification.

Third, the court permitted the defense wide latitude to introduce evidence of Perry's later inability to make an identification. And finally, the State's case included other physical evidence of McNeil-Lewis's guilt, like the gunshot residue on his hands and the expert testimony connecting the guns found at his sister's house with the bullets and shell casings found at the scene and in the deceased victim's body. For these reasons, any error was harmless.

## B. Procedurally Defaulted Arguments

McNeil-Lewis's final two arguments were not preserved for our review. The first involved the prosecutor's argument to the jury during the sentencing hearing. McNeil-Lewis argues the statement improperly appealed to the jury's passions and that we should review the argument even though defense counsel failed to object. But we have rejected these types of arguments before, noting that to preserve an argument for appeal regarding

9

closing statements, defense counsel must make a contemporaneous objection. *E.g.*, *Buckley v. State*, 349 Ark. 53, 68–70, 76 S.W.3d 825, 834–35 (2002).

The next issue involves the circuit court's denial of a posttrial motion about juror misconduct. The motion argued a juror failed to disclose being the child of the former Crittenden County Sheriff, even though asked about relation to law enforcement in the juror questionnaire and during voir dire. The motion noted that defense counsel discovered this possible relation "after the jury found the defendant guilty while waiting for a sentencing decision." Defense counsel is required to raise an issue of jury misconduct at the first opportunity. *Hendrix v. State*, 298 Ark. 568, 569, 768 S.W.2d 546, 547 (1989). The first opportunity would have been while waiting for sentencing. Yet counsel waited until fifteen days after the trial to file the motion. A motion for a new trial based on juror misconduct should contain a statement that the defense did not know about the misconduct until after trial. *Owens v. State*, 300 Ark. 73, 78, 777 S.W.2d 205, 207–08 (1989). Because counsel failed to raise the allegation *during* the trial proceedings, we do not consider the merits.

### III.  *Rule 4-3(a)*

In compliance with Arkansas Supreme Court Rule 4-3(a), the record has been examined for all objections, motions, and requests made by either party that the circuit court decided adversely to the appellant. No prejudicial error has been found.

Affirmed.

*Lassiter & Cassinelli*, by: *Michael Kiel Kaiser*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Rachel Kemp*, Sr. Ass't Att'y Gen.; and *Michael Zangari*, Ass't Att'y Gen., for appellee.