Cite as 2025 Ark. App. 607

# ARKANSAS COURT OF APPEALS

DIVISION III
No. CR-24-756

| | |
|---|---|
| MALIK DORITY<br><br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br><br>APPELLEE | Opinion Delivered December 10, 2025<br><br>APPEAL FROM THE MISSISSIPPI COUNTY CIRCUIT COURT, CHICKASAWBA DISTRICT [NO. 47BCR-23-43]<br><br>HONORABLE SCOTT A. ELLINGTON, JUDGE<br><br>AFFIRMED |

## KENNETH S. HIXSON, Judge

Appellant Malik Dority appeals after he was convicted by a Mississippi County Circuit Court jury of first-degree murder. He was sentenced to serve 144 months' incarceration. On appeal, appellant contends that (1) the circuit court erred in denying his motion for directed verdict because the circumstantial evidence presented was insufficient to prove he was an accomplice; and (2) the circuit court erred by allowing the admission of out-of-court statements made by the victim as dying declarations under Arkansas Rule of Evidence 804 and in violation of appellant's right to confrontation guaranteed under the Sixth Amendment. We affirm.

I. *Relevant Facts*

In brief summary, on January 17, 2023, appellant was driving his car with his cousin D'Andre Whitfield and codefendant Terry Hall in the back seat. Mr. Whitfield was held at

gunpoint. Appellant drove the car to an alley near an abandoned house, and the three men got out of the car. Mr. Whitfield ran and was shot once in the back. The bullet went through his esophagus and trachea. Appellant and Mr. Hall got back into the vehicle and sped away. Mr. Whitfield made some statements to law enforcement implicating appellant and Mr. Hall in his shooting before he died from his injuries. Appellant was later arrested and charged by felony information with first-degree murder in violation of Arkansas Code Annotated section 5-10-102 (Repl. 2024). The State further stated that appellant's sentence should be enhanced because he employed a firearm during the commission of a felony in violation of Arkansas Code Annotated section 16-90-120 (Supp. 2023).

Before trial, appellant filed a motion in limine on February 28, 2024, to exclude the introduction of recorded statements that the victim, Mr. Whitfield, made to law enforcement before his death. He argued that the admission of any testimonial out-of-court statements made by Mr. Whitfield made to law enforcement that implicated him as the cause of Mr. Whitfield's injuries violated his constitutional right to confront witnesses as guaranteed by the Confrontation Clause contained in the Sixth Amendment to the United States Constitution and by the Supreme Court of the United States in the case of *Crawford v. Washington*, 541 U.S. 36 (2004). He further argued that the State could not introduce the statements through any applicable hearsay exception found in Rules 803 or 804 of the Arkansas Rules of Evidence. A hearing on the motion was held on April 22, 2024.

At the hearing, Assistant Chief Vanessa Stewart of the Blytheville Police Department testified that, when she arrived at the scene of the shooting, Mr. Whitfield was lying in the

2

street and having difficulty breathing. A photograph of Mr. Whitfield after he had been shot was introduced at the hearing as well as a video of Stewart's interaction with Mr. Whitfield while he was lying in the street. When Assistant Chief Stewart asked Mr. Whitfield if he knew who shot him, he initially said it was someone associated with the Wall Street gang and "started spitting up blood." She also believed she heard him say the name "Evans." She explained that Mr. Whitfield had significant blood loss.

When the ambulance arrived, Mr. Whitfield was taken to a helicopter pad at the nearby Great River Medical Center. The initial intent was to airlift him to a hospital in Memphis. Assistant Chief Stewart followed the ambulance to the hospital. Once there, she spoke with Mr. Whitfield in the ambulance while the paramedics were trying to treat him. Mr. Whitfield seemed more coherent to her than he was in the street. Assistant Chief Stewart testified that, when she asked Mr. Whitfield if he could write the name of the person who shot him on a piece of paper, he gave her a "thumbs up." He then pulled his oxygen mask down and told her that appellant was the person who shot him. Because Mr. Whitfield had medical equipment attached to his fingers and "had blood on him," she decided to record his statement rather than have him write it. The audio recording was played at the hearing.

In the audio recording, Mr. Whitfield told Assistant Chief Stewart that he had been in the car with appellant and Percy Lee that day. It was later determined that the name "Percy Lee" was an alias used by Terry Hall. Mr. Whitfield initially said that Mr. Hall was driving but later corrected his statement and said that Mr. Hall had him at gunpoint in the

3

back seat of the car while appellant was driving. Mr. Whitfield further stated that when he got out of the car to run, appellant shot him. While Assistant Chief Stewart was speaking with appellant, Mr. Whitfield began to choke, and paramedics attempted to treat him. One paramedic noted that Mr. Whitfield had blood in his ear, but she was unsure where it was coming from. The paramedics ultimately concluded that Mr. Whitfield could not be transported by helicopter and decided to take him into the emergency room of the hospital. The paramedics attempted to resuscitate Mr. Whitfield while Assistant Chief Stewart ran into the emergency room, warning them to prepare to treat Mr. Whitfield. Mr. Whitfield died shortly afterward.

The State argued that Mr. Whitfield's statements were admissible under Arkansas Rule of Evidence 804 and *Crawford*, *supra*, as dying declarations. It emphasized Mr. Whitfield's condition when the statements were made and argued that there was "no question there was a sense of imminent death." Appellant's counsel disagreed and argued that the statements were inadmissible. After hearing arguments of counsel, the circuit court denied appellant's motion to exclude Mr. Whitfield's statements to Assistant Chief Stewart. The circuit court first found that on the basis of the photograph and video showing Mr. Whitfield's condition after he had been shot, Mr. Whitfield's statement to Assistant Chief Stewart was made "believing that his death was imminent[.]" The court also ruled that a "dying declaration is a traditional exception to the Sixth Amendment right to confrontation" and that the holding in *Crawford*, *supra*, did not bar the admission of a dying declaration.

Appellant's trial was held on April 23–26, 2024. Sergeant Cade Liles with the Blytheville Police Department testified that he responded to a call about the shooting on January 17, 2023. He said that he found Mr. Whitfield lying on the street suffering from an apparent gunshot wound. Sergeant Liles attempted to provide medical aid until EMS arrived and provided scene security. He later went to Great River Medical Center to collect Mr. Whitfield's clothing and shoes for evidence.

Three witnesses, Maurice Gross, Rupert Mitchell, and Jeffrey Merriweather, testified that they had been playing dominos outside on the porch at a house near the scene of the shooting. Each of them heard the gunshots. Mr. Gross testified that he walked over to Mr. Whitfield after he heard the gunshots, and Mr. Whitfield said "don't let them shoot me no more." Mr. Whitfield was "coughing up blood" and "a tooth came out." Mr. Gross later told law enforcement that he saw appellant standing near the scene in a white jacket after law enforcement had finished at the scene. Mr. Merriweather called 911.

Assistant Chief Stewart's testimony was consistent with her testimony offered at the pretrial hearing held on April 22, 2024, which we do not repeat. The audio recording of Mr. Whitfield's dying declarations made in the ambulance was played for the jury over appellant's renewed objection.

Jimmy Dority, Mr. Whitfield's father and appellant's uncle, testified that he received a phone call that his son had been shot. He said that after Mr. Whitfield's death, appellant asked to come to his home. He agreed because he did not think appellant had anything to do with his son's death at the time. Appellant denied ever being at the scene. A month

5

later, appellant had another conversation with Mr. Dority. At that time, appellant admitted that he was with Mr. Whitfield when he was shot. Appellant told him that Percy Lee (also known as Mr. Hall) jumped in his car, took appellant's key fob, and attempted to rob both of them at gunpoint. He said that Mr. Lee had shot Mr. Whitfield. Mr. Dority was aware that Mr. Whitfield owed appellant money.

Larivva Whitfield, Mr. Whitfield's mother and appellant's aunt, testified that she was aware that there had been trouble between appellant and Mr. Whitfield. She explained that appellant told her that Mr. Whitfield had stolen some money from him but "it was squashed." Appellant also told Ms. Whitfield that her son had left town and gone to Michigan after the money was stolen. Mr. Whitfield came back to Blytheville three weeks later and went to see Ms. Whitfield at the Dollar Tree where she worked. When he left, she saw appellant. By the time she came out of the store, appellant was walking down the sidewalk from Taco Bell and told her, "I'm finna whoop you son's ass." Ms. Whitfield stated that she had seen a Facebook live video taken by appellant of the incident, and the video was played for the jury.

Jamardre Foreman testified that he had met appellant in 2012 and then again in 2019. Mr. Foreman testified regarding scams that appellant had him run. He explained that he would obtain lines of credit, purchase equipment using the credit, and then sell the equipment on Facebook Marketplace. He would not pay back the lines of credit because appellant knew a "guy that worked there get rid of it at the computer." Mr. Foreman would give appellant the money from the sales, and appellant would pay him a small sum in return.

Mr. Foreman was arrested for those scams in Texas and Tennessee. He said that after his convictions, he worked for a lawncare service and tried to change. According to Mr. Foreman, appellant contacted him a week before the shooting and offered him $5,000 to shoot Mr. Whitfield because Mr. Whitfield had stolen $22,000 from appellant after one of the scam sales. Mr. Foreman testified that he declined the offer.

Detective Chelsey Grimes testified that she took pictures of the scene on the day of the shooting. Those pictures were admitted and published for the jury. During her investigation, she determined that Percy Lee was, in fact, Terry Hall. She also watched a video of the shooting that was taken at a distance from an outside security camera. That video was admitted and played for the jury. The vehicle driven by appellant was secured six days after the shooting. Detective Grimes testified that there was a pair of shoes in the trunk that matched a footprint at the scene of the shooting and that there was mail belonging to appellant in the glove box. She also was able to obtain a series of Facebook Messenger exchanges between Mr. Hall and appellant. Those messages were admitted into evidence over appellant's objection. At one point in the exchange, Mr. Hall told appellant, "I fwu gang the long way. Sometimes examples need to be set Family or not feel me." Appellant responded, "That's the same . . . I was thinking that's why ima demonstrate."

Dr. Stephen Erickson, the medical examiner from the Arkansas State Crime Laboratory, testified that he performed Mr. Whitfield's autopsy. He took various photographs that were admitted into evidence. Dr. Erickson's report was admitted into

evidence. He determined that Mr. Whitfield's cause of death was a single gunshot to the back, and the manner of death was homicide.

After the State presented its case-in-chief, defense counsel moved for directed verdict. He argued that the State had failed to prove accomplice liability. He explained that the dying declarations were inconsistent. The State disagreed and argued that any credibility issues are for the jury to decide. The circuit court denied appellant's motion.

Relevant to this appeal, appellant testified in his own defense. Appellant admitted that he committed the equipment scams that led to his pleading guilty to theft in Texas, Tennessee, and Arkansas. However, appellant denied that he murdered Mr. Whitfield. Appellant testified that Mr. Whitfield had stolen $22,000 in proceeds from the equipment scams that was owed to him. Although appellant admitted that he had threatened to beat Mr. Whitfield outside Dollar General, he said that he would "never kill" Mr. Whitfield. Instead, he claimed that before the shooting, Mr. Whitfield had repaid him some of the money, and appellant just took the remainder "as a loss" because he missed being around Mr. Whitfield. Appellant further claimed that at the time of the shooting, he was on "good terms" with Mr. Whitfield and denied offering Mr. Foreman $5,000 to shoot Mr. Whitfield.

Appellant testified that before Mr. Whitfield was shot, he was sitting in the driver's seat of his car with Mr. Whitfield in the front passenger seat. Mr. Hall approached the car on foot and asked for a ride. When appellant agreed, Mr. Hall got in the back seat. While driving, Mr. Hall stole appellant's key fob, pointed a gun at appellant, and instructed him to drive where he told him. Mr. Hall stole $400 from appellant and later told Mr. Whitfield

8

to get in the back seat with him. Mr. Hall asked Mr. Whitfield where "that money [he] just uploaded at Facebook" was, and Mr. Whitfield told him that it was at his uncle's home. When they were close to his uncle's home, Mr. Hall instructed him to pull into the alley nearby, and the three of them got out of the car. Mr. Hall had told them to walk to the home, but Mr. Whitfield started to run. Appellant testified that Mr. Hall then shot Mr. Whitfield. Appellant drove away with Mr. Hall in the front seat of the car, and appellant said at trial that Mr. Hall had threatened to kill appellant's aunt if appellant told anyone about the shooting.

A text-message exchange between appellant and Mr. Hall that occurred after the shooting was admitted into evidence. In those text messages, appellant told Mr. Hall that he was not going to "save" him and that he wanted his money back because "all [he] did was help [Mr. Hall] and try to keep [Mr. Hall] out of trouble." When Mr. Hall asked what he was going to say, appellant texted the following:

> I ain't gone say shit to the police my lawyer ain't gone let but I can't save you you took my shit after all I did for u and my lil cousin dead. You ain't have to do that shit u should of just took my shit and left. You need to send my bread ima be needing my shit to bond out.

Mr. Hall responded that he needed to make sure appellant did not "snitch" on him. When appellant was asked at trial why he would expect someone who had robbed him to give his money back, appellant testified that he wanted "to see" if Mr. Hall would give it back because he knew that Mr. Hall had killed his cousin.

9

On cross-examination, appellant admitted that he did not try to run away when he heard the gunshots but instead went to the driver's side of the car to wait for Mr. Hall. Appellant also admitted that he would make $20,000 to $40,000 a month from the scam sales he organized. Although appellant further admitted that he chased Mr. Whitfield around Dollar Tree after Mr. Whitfield stole money from him, he claimed that he had decided to "let bygones be bygones" because the family needed "to be back together." Appellant explained that he had lied to his uncle and aunt about not being at the scene because he wanted to protect his aunt and family.

At the close of all the evidence, appellant renewed his motion for directed verdict, which the circuit court denied. The jury found appellant guilty of first-degree murder but did not find him guilty of employing a firearm during the commission of a felony. Appellant was sentenced to serve 144 months' incarceration. This appeal followed.

## II. *Sufficiency of the Evidence*

We treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Armstrong v. State*, 2020 Ark. 309, 607 S.W.3d 491. In reviewing a sufficiency challenge, we assess the evidence in the light most favorable to the State and consider only the evidence that supports the verdict. *Id.* We will affirm a judgment of conviction if substantial evidence exists to support it. *Id.* Substantial evidence is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other without resorting to speculation or conjecture. *Id.* Circumstantial evidence may provide a basis to support a conviction, but it must be consistent with the defendant's

10

guilt and inconsistent with any other reasonable conclusion. *Collins v. State*, 2021 Ark. 35, 617 S.W.3d 701. Whether the evidence excludes every other hypothesis is left to the jury to decide. *Id.* Further, the credibility of witnesses is an issue for the jury, not the court; the trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence. *Armstrong, supra.*

This court has noted that a criminal defendant's intent or state of mind is seldom apparent. *Benton v. State*, 2020 Ark. App. 223, 599 S.W.3d 353. One's intent or purpose, being a state of mind, can seldom be positively known to others, so it ordinarily cannot be shown by direct evidence but may be inferred from the facts and circumstances. *Id.* Because intent cannot be proved by direct evidence, the fact-finder is allowed to draw on common knowledge and experience to infer it from the circumstances. *Id.* Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his or her acts. *Id.*

Pursuant to Arkansas Code Annotated section 5-10-102(a)(2), a person commits first-degree murder if with a purpose of causing the death of another person, the person causes the death of another person. Ark. Code Ann. § 5-10-102(a)(2). A person acts purposely with respect to his or her conduct or a result of his or her conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1) (Repl. 2024).

Under the theory of accomplice liability, "[a] person may commit an offense either by his or her own conduct or that of another person." Ark. Code Ann. § 5-2-401 (Repl. 2024).

11

"A person is criminally liable for the conduct of another person if . . . [t]he person is an accomplice of another person in the commission of an offense[.]" Ark. Code Ann. § 5-2-402(2) (Repl. 2024). A person is an accomplice of another person if, with the purpose of promoting or facilitating the commission of the offense, he or she solicits, advises, encourages, coerces, aids, agrees to aid, or attempts to aid in planning or committing the offense. Ark. Code Ann. § 5-2-403(a)(1)–(2) (Repl. 2024).

When a theory of accomplice liability is implicated, we affirm the circuit court's order in a sufficiency-of-the-evidence challenge if substantial evidence shows that the defendant acted as an accomplice in the commission of the alleged offense. *Price v. State*, 2019 Ark. 323, 588 S.W.3d 1. There is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned. *Id.* When two people assist one another in the commission of a crime, each is an accomplice and criminally liable for the conduct of all. *Id.* One cannot disclaim accomplice liability simply because he or she did not personally take part in every act that went to make up the crime as a whole. *Id.* Key factors in establishing accomplice liability include the defendant's proximity to the crime, opportunity to engage in it, and association with an involved party in a way that suggests joint participation. *Turner v. State*, 2024 Ark. 171, 699 S.W.3d 369. The defendant's actions and statements before or after the crime can also serve as corroborative evidence. *Id.*

On appeal, appellant does not dispute that he was present when Mr. Whitfield was shot. He also does not dispute that he did not inform law enforcement that an offense had been committed. Instead, he claims that there is a lack of substantial evidence that "he had

12

orchestrated the killing or was involved in its planning or execution in any capacity" to support his conviction of first-degree murder. He argues that the evidence offered at trial was merely circumstantial and that it "is entirely reasonable and plausible that Terry Hall acted alone and robbed Appellant and [Mr.] Whitfield at gunpoint." He further argues that Mr. Foreman's testimony was not credible, and Mr. Whitfield's dying declaration was not conclusive because appellant was not the "triggerman." We disagree.

Because an accomplice need not personally take part in every act that went to make up the crime as a whole, it is immaterial whether appellant was the person who actually pulled the trigger in shooting Mr. Whitfield. Here, the jury heard testimony that appellant had been angry with Mr. Whitfield for stealing $22,000 from him and that he told Mr. Hall in a Facebook message that he would "demonstrate." In fact, appellant chased and threatened Mr. Whitfield at Dollar General in December 2022. Mr. Foreman testified that appellant had offered him $5,000 to shoot Mr. Whitfield just a week before Mr. Whitfield was murdered. The jury saw the video of Mr. Whitfield running away from appellant and Mr. Hall when he was shot and that Mr. Hall and appellant afterwards fled the scene together. The jury also heard a recording of Mr. Whitfield telling Assistant Chief Stewart that Mr. Hall held him in the back seat at gunpoint while appellant drove and that appellant had shot him when he ran. After the shooting, appellant told Mr. Whitfield's parents that he had not been at the scene when Mr. Whitfield was shot. Moreover, there was a text-message conversation between Mr. Hall and appellant that was admitted into evidence. Although appellant claimed that he was also a victim of robbery and did not act as an

13

accomplice, the jury was free to believe all or part of appellant's explanation or to believe the State's version of the facts. *Turner, supra*.; *see Smith v. State*, 2022 Ark. 95. Thus, we hold that the evidence above, viewed in the light most favorable to the State, constitutes substantial evidence of appellant's participation as an accomplice in the first-degree murder of Mr. Whitfield. Accordingly, we affirm on this point.

III. *Dying Declarations*

Appellant argues that the circuit court erred by allowing the admission of out-of-court statements made by the victim as dying declarations under Arkansas Rule of Evidence 804 and in violation of appellant's right to confrontation guaranteed under the Sixth Amendment. Hearsay statements are admissible against a defendant in a criminal trial when two conditions are met. First, the statement must fall under a hearsay exception; second, the statement cannot violate the defendant's Sixth Amendment right to confront witnesses against him. *McNeil-Lewis v. State*, 2023 Ark. 54, 661 S.W.3d 195. We address each issue separately.

A. Rule 804

Appellant specifically argues that the circuit court erred in admitting the out-of-court statements as dying declarations because "there was no evidence presented that demonstrated that [Mr.] Whitfield believed that his death was imminent and inevitable." We disagree.

In Arkansas, hearsay is defined as a statement other than one made by the declarant while testifying at trial or hearing offered in evidence to prove the truth of the matter

14

asserted. Ark. R. Evid. 801(c). Hearsay is inadmissible except as provided by law or by the rules of evidence. Ark. R. Evid. 802. Rule 804 of the Arkansas Rules of Evidence provides hearsay exceptions that apply when the declarant of a statement is unavailable. One of these exceptions to the hearsay rule is a statement made under belief of impending death, commonly referred to as a "dying declaration." *Grant v. State*, 357 Ark. 91, 161 S.W.3d 785 (2004). A dying declaration is defined as a statement made by a declarant while believing that his death was imminent concerning the cause or circumstances of what he believed to be his impending death. Ark R. Evid. 804(b)(2); *Grant, supra.* Dying declarations are deemed inherently trustworthy. *Plessy v. State*, 2012 Ark. App. 74, 388 S.W.3d 509. The principal consideration upon which such statements are admitted is that one who realizes that death is inevitable in consequence of the injury inflicted speaks with solemnity and will not resort to fabrication in order to unjustly punish another. *Id.* The circuit court makes the preliminary determination of whether the evidence is admissible and on review, we will reverse that determination only if there is an abuse of discretion. *Simpkins v. State*, 48 Ark. App. 14, 889 S.W.2d 37 (1994). Our appellate courts have held that a sense of imminent death need not be shown by the declarant's express words alone but can be supplied by inferences fairly drawn from his condition. *Grant, supra*; *Plessy, supra.*

Here, Mr. Whitfield had been shot in the back, and the bullet went through his esophagus and trachea. Chief Assistant Stewart testified that Mr. Whitfield was struggling to breathe and spitting up blood. A video of Mr. Whitfield immediately after he was shot and lying in the street was introduced at the motion hearing. Although Chief Assistant

15

Stewart thought Mr. Whitfield was a little more coherent in the ambulance, paramedics were treating him while he was making statements. There were times that he gasped and choked, and even one paramedic can be heard saying that there was blood coming from Mr. Whitfield's ear, but she was unsure why. Considering the obvious severity of Mr. Whitfield's injuries and his difficulty to breathe, we cannot conclude that the circuit court abused its discretion in determining his statements were dying declarations and admissible at trial. Accordingly, we affirm the circuit court's ruling.

## B. Confrontation Clause

Having held that Mr. Whitfield's statements were dying declarations for the reasons stated above, we discuss whether the admission of Mr. Whitfield's dying declarations violated appellant's Sixth Amendment right to confront witnesses against him. Appellant specifically argues that the circuit court erred in "finding that there was no right to confrontation and dying declarations are a carte blanche exception based solely on its historical precedent." We affirm.

The Confrontation Clause in the Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. Article 2, section 10 of the Arkansas Constitution reiterates that same right of confrontation. The Arkansas Supreme Court has consistently interpreted both clauses to provide identical rights. *Smith v. State*, 340 Ark. 116, 8 S.W.3d 534 (2000). We review constitutional questions about the Confrontation Clause de novo. *McNeil-Lewis*, 2023 Ark. 54, 661 S.W.3d 195.

The Supreme Court held in *Crawford, supra*, that testimonial statements[1] are inadmissible under the Confrontation Clause when the declarant is unavailable and the defendant did not have an opportunity to cross-examine the declarant. 541 U.S. at 68. The Court noted that the only exceptions to the right of confrontation are those that were established at the time of the nation's founding. *Id.* at 54. Although the Supreme Court has not explicitly announced that dying declarations are an exception to the right to confrontation, it has suggested in dicta that there may be such an exception. In *Crawford*, the Court noted, "Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are." 541 U.S. at 56 n.6. The Court declined to decide whether there was an exception for testimonial dying declarations but observed that "[i]f this exception must be accepted on historical grounds, it is *sui generis*." *Id.*

Four years after *Crawford*, the Supreme Court again addressed a defendant's confrontation rights when a witness is unavailable to testify at trial; however, the focus was on the doctrine of forfeiture by wrongdoing, which is not at issue here. *See Giles v. California*, 554 U.S. 353 (2008). The Supreme Court reiterated that "the Confrontation Clause requires that a defendant have the opportunity to confront the witnesses who give testimony against him, *except in cases where an exception to the confrontation right was recognized at the time of the founding*." *Id.* at 357 (emphasis added). In its discussion, the Supreme Court further stated that it had "previously acknowledged that two forms of testimonial statements were

---

[1]It is undisputed in this case that Mr. Whitfield's statements were testimonial for purposes of our analysis.

17

admitted at common law even though they were unconfronted. The first of these were declarations made by a speaker who was both on the brink of death and aware that he was dying." *Id.* at 358 (citations omitted). Because the statements at issue in *Giles* were not made while the victim was dying, the Supreme Court concluded that the statements did "not fall within [that] historic exception." *Id.* at 359.

Although our supreme court has not specifically opined on whether testimonial dying declarations are an exception to the rule in *Crawford*, other states have done so and determined that they are. *See State v. Buchan*, 993 N.W.2d 614 (Minn. 2023); *State v. Williamson*, 249 A.3d 478 (2021); *Com. v. Nesbitt*, 892 N.E.2d 299 (2008); *State v. Lewis*, 235 S.W.3d 136 (Tenn. 2007); *People v. Monterroso*, 101 P.3d 956, 972 (2004). Appellant acknowledges this fact; however, he nevertheless urges this court not to follow suit. In light of the Supreme Court's guidance in *Crawford* and *Giles* and the persuasive authority from other jurisdictions as cited above, we agree with the circuit court that testimonial dying declarations are an exception to the rule in *Crawford* and pose no conflict with the Confrontation Clause. Accordingly, we affirm.

Affirmed.

KLAPPENBACH, C.J., and BARRETT, J., agree.

*Law Offices of John Wesley Hall*, by: *Samantha J. Carpenter*, for appellant.

*Tim Griffin*, Att'y Gen., by: *Jacob Jones*, Ass't Att'y Gen., for appellee.

18